IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Ultimate Hearing Solutions II, LLC; Ultimate Hearing Solutions III, LLC; Ultimate Hearing Solutions IV, LLC; Ultimate Hearing Solutions V, LLC; Ultimate Hearing Solutions VI, LLC, Clear Hearing Solutions, LLC, Clear Hearing Soluti ons II, LLC, Clear Hearing Solutions III, LLC; and Clear Hearing Solutions IV, LLC<br><br>Plaintiffs,<br>vs.<br><br>Hartford Underwriters Insurance Company, The Hartford Financial Services Group, Inc. d/b/a The Hartford, Twin Cities Fire Insurance Company, Continental Casualty Company, and CNA Financial Corporation,<br><br>Defendants. | Case No._____<br><br><br><br><br><br><br><br><br><br>**COMPLAINT** |

Plaintiffs Ultimate Hearing Solutions II, LLC; Ultimate Hearing Solutions III, LLC; Ultimate Hearing Solutions IV, LLC; Ultimate Hearing Solutions V, LLC Ultimate Hearing Solutions VI, LLC, and Clear Hearing Solutions, LLC, Clear Hearing Solutions II, LLC, Clear Hearing Solutions III, LLC; Clear Hearing Solutions IV, LLC ("Plaintiffs"), by way of Complaint against Defendants Hartford Underwriters Insurance Company, The Hartford Financial Services Group, Inc., and Twin Cities Fire Insurance Company (collectively, "The Hartford") and Continental Casualty Company and CNA Financial Corporation (collectively, "CNA") (collectively, "Defendants"), allege as follows:

2428505.1

## INTRODUCTION/BACKGROUND

1. On March 11, 2020 World Health Organization Director General Tedros Adhanom Ghebreyesus declared the COVID-19 outbreak a worldwide pandemic: "WHO has been assessing this Outbreak around the clock and we are deeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction. We have therefore made the assessment that COVID-19 can be characterized as a pandemic."[1]

2. On March 16, 2020, the Centers for Disease Control and Prevention, and members of the National Coronavirus Task Force issued to the American public guidance, styled as "30 Days to Slow the Spread" for stopping the spread of COVID-19. This guidance advised individuals to adopt far-reaching social distancing measures, such as working from home, avoiding shopping trips and gatherings of more than 10 people, and staying away from bars, restaurants, and food courts.[2]

3. Following this advice for individuals to adopt far-reaching social distancing measures, many state government administrations across the nation recognized the need to take steps to protect the health and safety of their residents from the human to human and surface to human spread of COVID-19. As a result, many governmental entities entered civil authority orders suspending or severely curtailing business operations of non-essential businesses that interact with the public and provide gathering places for the individuals. Currently, almost all states within the United States have issued some sort of "stay-at-home" order and ordered private non-essential business operations to close.

---

[1] See https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the- media-briefing-on-COVID-19 11-march-2020
[2] See https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf

4.     The result of these far-reaching restrictions and prohibitions has been catastrophic for most non-essential businesses, especially retail establishments, and other small, medium, and large businesses who have been forced to close, furlough employees, and endure a sudden shutdown of cash flow that threatens their survival.

5.     Most businesses insure against such catastrophic events like the current unforeseen COVID-19 pandemic through all-risk commercial property insurance policies.  These policies promise to indemnify the policyholder for actual business losses incurred when business operations are involuntarily suspended, interrupted, curtailed, when access to the premises is prohibited because of direct physical loss or damage to the property, or by a civil authority order that restricts or prohibits access to the property.  This coverage is commonly known as "business interruption coverage" and is standard in most all-risk commercial property insurance policies.

6.     Defendants who have issued commercial property insurance policies with business interruption coverage, are denying the obligation to pay for business income losses and other covered expenses incurred by policyholders for the physical loss and damage to the insured property from measures put in place by the civil authorities to stop the spread of COVID-19 among the population.

7.     This action brings a claim against Defendants for their breach of their contractual obligation under their respective commercial property insurance policies to indemnify Plaintiffs for business losses and extra expenses, and related losses resulting from actions taken by civil authorities to stop the human to human and surface to human spread of the COVID-19 outbreak.

## THE PARTIES

8.     Plaintiffs Ultimate Hearing Solutions II, LLC; Ultimate Hearing Solutions III, LLC; Ultimate Hearing Solutions IV, LLC; Ultimate Hearing Solutions V, LLS: Ultimate Hearing Solutions VI, LLC, ("UHS") are limited liability companies which operate hearing aid

stores. Plaintiffs UHS are citizens of Pennsylvania, whose principal place of business is 471 Baltimore Pike, Springfield Pennsylvania 19064 are limited liability companies which operate hearing aid stores and provides hearing tests, hearing aids, and after-care for existing patients. Plaintiffs UHS also operate stores in other locations in Pennsylvania, including Glen Mills, and Media and in Dover and Lewes Delaware. As well as the following in Maryland: Salisbury, Ocean City, Forest Hill, Owings Mills, Towson, Annapolis, Nottingham, Cumberland and Hagerstown and one office in Winchester, Virginia.

9. Plaintiffs Clear Hearing Solutions, LLC, Clear Hearing Solutions II, LLC, Clear Hearing Solutions III, LLC, and Clear Hearing Solutions IV, LLC, ("CHS") are limited liability companies which operate hearing aid stores and provides hearing tests, hearing aids, and after-care for existing patients. Plaintiff sCHS are citizens of Pennsylvania, whose principal place of business is 471 Baltimore Pike, Springfield Pennsylvania 19064. Plaintiffs CHS also operate stores in Maryland locations in: Bowie, Bethesda and Rockville, and in the following North Carolina locations: Pittsboro, Durham, Aberdeen, Fayetteville.

10. Defendant The Hartford is a collection of property and casualty insurance companies doing business under the name The Hartford. This Defendant is a citizen of Connecticut being organized under the laws of the State of Connecticut and with its headquarters and principal place of business at One Hartford Plaza, Hartford, Connecticut 06155. On information and belief, the other Hartford companies are subsidiaries of The Hartford Financial Services Group, Inc.

11. Defendant Continental Casualty Company is a property and casualty company engaged in the business of selling insurance contracts to commercial entities such as Plaintiffs CHS in Illinois and elsewhere. This Defendant is a citizen of Illinois, with its headquarters and

principal place of business in Chicago, Illinois.  On information and belief, Continental Casualty Company is the subsidiary of CNA Financial Corporation.

12.     Defendant CNA Financial Corporation is a property and casualty company.  This Defendant is a citizen of Illinois, with its headquarters and principal place of business in Chicago, Illinois.  On information and belief, CNA Financial Corporation is the parent company of Continental Casualty Company.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) in that the amount in controversy exceeds $75,000, exclusive of interest and costs, and the parties are citizens of different states:  Plaintiffs and the members of each their LLCs are citizens of Pennsylvania and Defendants are citizens of Connecticut and Illinois.

14.     This Court has personal jurisdiction over Defendants, as Defendants are registered to conduct business in this Commonwealth, regularly conduct business in Pennsylvania, and have sufficient contacts in Pennsylvania.  Defendants intentionally avail themselves of this jurisdiction by conducting operations here and promoting, selling, and marketing Defendants' policies of insurance to resident Pennsylvania consumers and entities.

15.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District and because a substantial part of the Plaintiffs' insured properties that are the subject of the action are situated in this District.  Moreover, Defendants do business in this District and thus reside in this District, in accordance with 28 U.S.C. § 1391(c).

**FACTUAL ALLEGATIONS**

A. **The Hartford Policy**

1. In return for the payment of a premium, The Hartford issued Policy No. 39 SBA AA3300 to Plaintiffs UHS (hereinafter, the "Hartford Policy"). Policy No. 39 SBA AA3300 is attached hereto as Exhibit A.

2. The Covered Properties and Scheduled Premises under the Hartford Policy include the following:

   i. 600 Town Centre Dr, Glen Mills PA 19342.

   ii. 18462 Plantations Blvd, Lewes DE 19958.

   iii. 8837 Belair Rd, Nottingham MD 21236.

   iv. 701 E Naylor Mill Rd, Salisbury MD 21804.

   v. 1521 Rock Spring Rd, Forest Hill MD 21050.

   vi. 9351 Lakeside Blvd, Owings Mill MD 21117.

   vii. 1220A E Joppa Rd, Towson MD 21286.

   viii. 509 S Cherry Grove Ave, Annapolis MD 21401.

   ix. 1163 West Baltimore Pike, Media PA 19063.

   x. 11724 Ocean Gateway Unit 4, Ocean City MD 21842.

   xi. 137 Jerome Drive, Ste 120, Dover DE 19901.

   xii. 353-535 Baltimore Pike, Springfield PA 19064.

   xiii. 222 East Oak Ridge Rd., Hagerstown, Maryland, 21740.

   xiv. 701 Park Street, Cumberland, Maryland, 21502.

   xv. 3111 Valley Ave, Unit 12C, Winchester, Virginia, 22601.

3.      The Hartford Policy is currently in full effect, providing property, business personal property, business income and extra expense, extended business income, virus, and civil authority coverage for a policy period of April 23, 2019 to April 23, 2020 and April 23, 2020 to April 23, 2021.

4.      Plaintiffs UHS have performed all of their obligations under the Hartford Policy, including the payment of the premium.

5.      Most property policies sold in the United States, including the Hartford Policy sold by The Hartford, is an all-risk property damage policy.  This type of policy covers all risks of loss except for risks that are expressly and specifically excluded.

6.      Pursuant to the "Special Property Coverage Form," Form SS 00 07 07 05 the Hartford Policy covers "direct physical loss of or direct physical damage to Covered Property. . . caused by or resulting from a Covered Cause of Loss."  "Covered Cause of Loss" means "risks of direct physical loss unless the loss is Excluded …or Limited…"

7.      The Hartford Policy contains the Business Income, and Extra Expense endorsements, the Virus Endorsement (Form SS 40 93), and the Civil Authority endorsement. Coverage extensions provided within these endorsements include payment for lost business income, normal operating expenses incurred (including payroll expenses), extended business income during a period of restoration, and extra expenses for expenses that would not have been incurred but for the loss or damage.

8.      The Hartford Policy's Business Income and Civil Authority endorsements contain no exclusion for losses caused by governmental orders issued in order to prevent exposure to a virus, and no other exclusion in the policies apply to this coverage.

9. Moreover, the Hartford Policy expressly provides "Fungus, Bacteria or Virus coverage" in the amount of $50,000 per location.

10. Despite this express coverage language, defendant Hartford has denied coverage in willful disregard of its obligations under its policy as well as under Pennsylvania law.

**B.  The CNA Policy**

11. In return for the payment of a premium, CNA issued Policy No. B 6024961648 to Plaintiffs CHS  (hereinafter, the "CNA Policy").  The CNA Policy is attached hereto as Exhibit B.

12. The Covered Properties and Scheduled Locations under the CNA Policy include the following:

  i. 12420 Fairway Pkwy. STE 103, Store #1, Bowie, MD 20720.

  ii. 11621 Nebel St. STE A, Store #2, North Bethesda, MD 20852.

  iii. 404 King Farm Blvd. STE 140, Store #2, Rockville, MD 20850.

  iv. 959 East St., Store#2, Pittsboro, NC 27312.

  v. 3405 Hillsborough Rd, Store #2, Durham, NC 27705.

  vi. 1733A NC Highway 5, Store #2, Aberdeen, NC 28315.

  vii. 211 Owen Dr, Store #2, Fayetteville, NC 28304.

13. The CNA Policy is currently in full effect, providing property, business personal property, business income and extra expense, extended business income, virus, and civil authority coverage for a policy period of September 18, 2019 to September 18, 2020.

14. Plaintiffs CHS have performed all of their obligations under the CNA Policy, including the payment of the premium.

15. Most property policies sold in the United States, including the CNA Policy sold by CNA, is an all-risk property damage policy. This type of policy covers all risks of loss except for risks that are expressly and specifically excluded.

16. Pursuant to the "Special Property Coverage Form," Form SB-146801-I the CNA Policy covers "direct physical loss of or direct physical damage to Covered Property. . . caused by or resulting from a Covered Cause of Loss." "Covered Cause of Loss" means "risks of direct physical loss unless the loss is Excluded …or Limited…"

17. The CNA Policy contains the Business Income, and Extra Expense endorsements, and the Civil Authority endorsement. Coverage extensions provided within these endorsements include payment for lost business income, normal operating expenses incurred (including payroll expenses), extended business income during a period of restoration, and extra expenses for expenses that would not have been incurred but for the loss or damage.

18. The CNA Policy's Business Income and Civil Authority endorsements contain no exclusion for losses caused by governmental orders issued in order to prevent exposure to a virus, and no other exclusion in the policies apply to this coverage.

C. **The Covered Cause of Loss**

19. Efforts to prevent exposure to COVID-19 have caused civil authorities throughout the country to issue orders requiring the suspension of non-essential businesses and preventing citizens from leaving home for non-essential purposes (the "Closure Orders").

20. Plaintiffs' businesses are not considered "essential," and have therefore been subject to a variety of Closure Orders by state and local authorities, preventing Plaintiffs from operating their businesses, limiting their operations, and/or from use of the covered premises for their intended purpose.

21.     These Closure Orders include, but are not limited to, Pennsylvania Governor Wolf's order dated March 19, 2020 requiring all non-life-sustaining businesses in the Commonwealth to cease operations and close all physical locations.[3] The Pennsylvania Supreme Court recently clarified that the Governor's order has resulted in the temporary loss of use of non-essential business premises effected by the order, and that the order was issued to protect the lives and health of millions of Pennsylvania citizens.  Similar Closure Orders were declared by the Governors of Maryland, Virginia, North Carolina and Delaware. S*ee Friends of DeVito v. Wolf,* No. 68 MM 2020, 2020 WL 1847100 at *17 (Pa. Apr. 13, 2020).

22.     There was no presence of the COVID-19 virus at Plaintiffs' Covered Properties. Rather, Plaintiffs experienced a "Covered Cause of Loss" by virtue of the Closure Orders which denied use of the Covered Properties by causing a necessary suspension of operations during a period of restoration.  The presence or absence of the COVID-19 virus would have no effect upon the closure or the loss of business inasmuch as the stay at home orders apply to all non-essential businesses regardless of their exposure to the virus.   The Closure Orders operate as a blockade that prevents employees and patrons from entering the businesses for their intended purpose.

23.     This Covered Cause of Loss triggered coverage pursuant to the coverage extensions of the Policies' Business Income endorsements.

24.     The Hartford Policy's Business Income coverage extension provides coverage "for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration.' The suspension must be caused by direct physical loss or direct physical damage to property. . . caused by or resulting from a Covered Cause of

---

[3] Available at https://www.scribd.com/document/452416027/20200319-TWW-COVID-19-Business-Closure-Order

Loss." The Extended Business Income coverage extension further provides for payment of the actual loss of Business Income the insured incurs during the period that begins on the date that "property is actually repaired, rebuilt or replaced and 'operations' are resumed," and ends on the earlier of the date that either the insured could restore "operations" with reasonable speed, or 30 days. The Extra Expense coverage extension covers reasonable and necessary extra expenses incurred by the insured during the "period of restoration," that the insured would not have incurred if there had been no direct physical loss or direct physical damage to property.

25. The CNA Policy's Business Income coverage extension provides coverage "for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration.' The 'suspension' must be caused by direct physical loss or direct physical damage to property. . . caused by or result from a Covered Cause of Loss." The loss of Business Income is covered up to 30 consecutive days when caused as a direct result of damage, by a Covered Cause of Loss, to property adjacent to the insured's premises. The Extended Business Income coverage extension further provides for payment of the actual loss of Business Income the insured sustains during the period that begins on the date that "property is actually repaired, rebuilt or replaced and 'operations' are resumed," and ends on the earlier of the date that either the insured could restore "operations" with reasonable speed, or 60 days. The Extra Expense coverage extension covers reasonable and necessary extra expenses incurred by the insured during the "period of restoration," that the insured would not have incurred if there had been no direct physical loss of or direct physical damage to property caused by or resulting from a Covered Cause of Loss. As provided in the Declarations, CHS purchased additional coverage for Business Income and Extra Expense coverage for actual loss sustained for 12 consecutive months following the date of direct physical loss or damage.

26. Consistent with the provisions of the Hartford Policy's Civil Authority endorsement, the "Covered Cause of Loss" also caused a direct physical loss or damage to property other than at Plaintiffs UHS's Scheduled Premises, triggering coverage under the Hartford Policy's Civil Authority coverage extension.  The coverage extension provides payment for actual loss of Business Income and necessary Extra Expense incurred during the "civil authority period of restoration."

27. Consistent with the provisions of the CNA Policy's Civil Authority endorsement, the "Covered Cause of Loss" also caused a direct physical loss or damage to property other than at Plaintiffs CHS's Scheduled Premises, triggering coverage under the CNA Policy's Civil Authority coverage extension.  The coverage extension provides payment for actual loss of Business Income (beginning 24 hours after the time of that action and applying for a period of four consecutive weeks after coverage begins) and Extra Expense incurred (beginning immediately after the time of that action and ending when the Business Income coverage ends).

28. None of the Policies' exclusions apply to Plaintiffs' claims for coverage.

## CLAIMS FOR RELIEF

### COUNT I

**BREACH OF CONTRACT**
**BUSINESS INCOME COVERAGE**
**Plaintiffs UHS v. Defendant The Hartford**

29. Plaintiffs reallege the above paragraphs as if fully set forth herein.

30. Plaintiffs UHS's Hartford Policy is a contract under which The Hartford was paid premiums in exchange for its promise to pay Plaintiffs UHS's losses for claims covered by the Hartford Policy.

31. In the Business Income and Extra Expense endorsement, The Hartford provided Business Income, Extended Business Income, and Extra Expense coverage extensions.

32. The Hartford agreed to pay for its insured's actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration."

33. A "partial slowdown or complete cessation" of business activities at the Scheduled Premises is a "suspension" under the Policy, for which The Hartford agreed to pay for loss of Business Income during the "period of restoration," as well as continuing normal operating expenses incurred, including payroll expenses.

34. "Business Income" means net income (or loss) before tax that Plaintiffs UHS would have earned "if no physical loss or damage had occurred."

35. The Extended Business Income coverage extension provides for payment of the actual loss of Business Income the insured incurs during the period that begins on the date that "property is actually repaired. . . and 'operations' are resumed," and ends on the earlier of the date that either the insured could restore "operations" with reasonable speed, or 30 days.

36. The Extra Expense coverage extension provides for payment of reasonable and necessary Extra Expense an insured incurs during the "period of restoration" that the insured would not have incurred if there had been no direct physical loss or direct physical damage to property at the Scheduled Premises.

37. The Closure Orders caused direct physical loss and damage to Plaintiffs UHS's Scheduled Premises, requiring suspension of operations at the Scheduled Premises. Losses caused by the Closure Orders thus triggered the Business Income provision of Plaintiffs UHS's Harford Policy.

38. Plaintiffs UHS have complied with all applicable provisions of the Policy and/or those provisions have been waived by The Hartford, or The Hartford is estopped from asserting them, and yet The Hartford has abrogated its insurance coverage obligations.

39. By denying coverage for any Business Income losses incurred by Plaintiff UHS, The Hartford has breached its coverage obligations under the Policy.

40. As a result of The Hartford's breaches of the Policy, Plaintiffs UHS have sustained substantial damages for which The Hartford is liable, in an amount to be established at trial.

## COUNT II

### BREACH OF CONTRACT
### BUSINESS INCOME COVERAGE
### Plaintiffs CHS v. Defendant CNA

41. Plaintiffs reallege the above paragraphs as if fully set forth herein.

42. Plaintiffs CHS CNA Policy is a contract under which CNA was paid premiums in exchange for its promise to pay Plaintiffs CHS's losses for claims covered by the CNA Policy.

43. In the Business Income and Extra Expense endorsement, CNA provided Business Income, Extended Business Income, and Extra Expense coverage extensions.

44. CNA agreed to pay for its insured's actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration."

45. A "partial slowdown or complete cessation" of business activities at the Scheduled Premises is a "suspension" under the Policy, for which CNA agreed to pay for loss of Business Income during the "period of restoration."

46. "Business Income" means net income (or loss) before tax that Plaintiffs CHS would have earned as well as continuing normal operating expenses incurred, including payroll expenses.

47. The Extended Business Income coverage extension provides for payment of the actual loss of Business Income the insured sustains during the period that begins on the date that "property is actually repaired. . . and 'operations' are resumed," and ends on the earlier of the date that either the insured could restore "operations" with reasonable speed, or 60 days.

48. The Extra Expense coverage extension provides for payment of reasonable and necessary Extra Expense an insured incurs during the "period of restoration" that the insured would not have incurred if there had been no direct physical loss or direct physical damage to property caused by or resulting from a Covered Cause of Loss.

49. The Business Income and Extra Expense coverage extension provides for loss of Business Income and Extra Expense that occurs within 12 consecutive months following the date of direct physical loss or damage.

50. The Closure Orders caused direct physical loss and damage to Plaintiffs CHS's Scheduled Premises, requiring suspension of operations at the Scheduled Premises. Losses caused by the Closure Orders thus triggered the Business Income provision of Plaintiffs CHS's CNA Policy.

51. Plaintiffs CHS complied with all applicable provisions of the CNA Policy and/or those provisions have been waived by CNA, or CNA is estopped from asserting them, and yet CNA has abrogated its insurance coverage obligations.

52. By denying coverage for any Business Income losses incurred by Plaintiffs CHS, CNA has breached its coverage obligations under the CNA Policy.

53. As a result of CNA's breaches of the CNA Policy, Plaintiffs CHS have sustained substantial damages for which CNA is liable, in an amount to be established at trial.

## COUNT III

### BREACH OF CONTRACT – CIVIL AUTHORITY COVERAGE
### All Plaintiffs vs. All Defendants

54. Plaintiffs reallege the above paragraphs as if fully set forth herein.

55. Plaintiffs' Policies are contracts under which Defendants were paid premiums in exchange for its promise to pay Plaintiffs' losses for claims covered by the Policies.

56. In the Business Income for Civil Authority Actions endorsement, Defendants agreed to pay for its insureds' actual loss of Business Income and Extra Expense incurred due to the necessary suspension of its operations during the "period of restoration."

57. The Closure Orders caused direct physical loss and damage to property other than Plaintiff's Scheduled Premises, resulting in a prohibition of access to the Scheduled Premises. Losses caused by the Closure Orders thus triggered the Business Income for Civil Authority Actions provision of Plaintiffs' Policies.

58. Plaintiffs have complied with all applicable provisions of their Policies and/or those provisions have been waived by the Defendants, or the Defendants are estopped from asserting them, and yet the Defendants has abrogated their insurance coverage obligations.

59. By denying coverage for any Civil Authority losses incurred by Plaintiffs, Defendants have breached their coverage obligations under the Policies.

60. As a result of Defendants' breaches of the Policies, Plaintiffs have sustained substantial damages for which Defendants are liable, in an amount to be established at trial.

## COUNT IV

### BAD FAITH
### Plaintiffs CHS v. Defendant CNA

61. The foregoing paragraphs are incorporated at length as if set forth fully herein.

62. Defendant CNA has no actual basis for declining complete coverage of the plaintiffs' claim for damages.

63. The refusal of defendant to compensate plaintiffs CHS for losses sustained and its practices in the handling of the claim constitute bad faith towards the insured.

64. Defendant has declined coverage in an intentional, willful and wanton disregard of the terms of the Policy.

**WHEREFORE**, plaintiffs CHS demands judgment in their favor and against defendant CNA in an amount in excess of $50,000.00, attorney's fees, pre- and post-judgment interest, delay damages, punitive damages, treble damages, cost of suit, and such other legal and equitable relief as this court deems just and proper.

## COUNT V

### BAD FAITH
### Plaintiffs UHS v. Defedant The Hartford

65. The foregoing paragraphs are incorporated at length as if set forth fully herein.

66. Defendant The Harford has no actual basis for declining complete coverage of the plaintiffs' claim for damages.

67. The refusal of defendant to compensate plaintiffs for losses sustained and its practices in the handling of the claim constitute bad faith towards the insured.

68. Defendant has declined coverage in an intentional, willful and wanton disregard of the terms of the Policy.

**WHEREFORE**, plaintiffs UHS demands judgment in their favor and against defendant The Hartford in an amount in excess of $50,000.00, attorney's fees, pre- and post-judgment interest, delay damages, punitive damages, treble damages, cost of suit, and such other legal and equitable relief as this court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against the respective Defendants as follows:

    a.    Entering judgment in favor of Plaintiffs and awarding damages for breach of contract in an amount to be determined at trial;

    b.    Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded;

    c.    Ordering Defendants to pay attorneys' fees, reasonable expenses and costs of suit; and

    d.    Ordering such other and further relief as may be just and proper.

        **SHERMAN, SILVERSTEIN, KOHL,**
        **ROSE & PODOLSKY, P.A.**

By:    *s/Alan C. Milstein*
        Alan C. Milstein
        308 Harper Drive, Suite 200
        Moorestown, NJ 08057
        Telephone: 856-662-0700
        E-Mail: amilstein@shermansilverstein.com
        *Attorneys for Plaintiffs*

**Dated: Thursday, May 21, 2020**