EXHIBIT 7

CERTIFIED COPY

1    THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2           FOR THE COUNTY OF MONTEREY

3

```
_____
```
4  The Inns by the Sea       )
                            )
5  vs.                    ) CASE NO. 20CV001274
                            )
6  California Mutual Insurance   )
  Company                )
7  `_____`)

8

9         REPORTER'S TRANSCRIPT OF PROCEEDINGS

10          MONDAY, AUGUST 4, 2020

11     BEFORE THE HONORABLE LYDIA M. VILLARREAL, JUDGE

12

13  APPEARANCES:

14  FOR PLAINTIFF:         SAM FERGUSON
  (APPEARING ON COURT CALL)  ATTORNEY AT LAW
15
                        MICHAEL J. REISER
16                      ATTORNEY AT LAW

17

18  FOR DEFENDANT:         RYAN Z. KELLER
  (APPEARING ON COURT CALL)  ATTORNEY AT LAW
19
                        STEVEN HAYES
20                      ATTORNEY AT LAW

21

22

23

24  REPORTED BY:  JAMIE L. SETTERQUIST CSR 13362
               OFFICIAL COURT REPORTER
25               MONTEREY COUNTY SUPERIOR COURT

1

```
 1      MONTEREY, CA; Monday, August 6, 2020; 9:24 A.M.

 2

 3                    P R O C E E D I N G S

 4           THE COURT:  Inns by the Sea versus California

 5      Mutual Insurance Company.

 6           MR. KELLER:  Good morning Your Honor.  Ryan

 7      Keller on the phone for Defendant, California Mutual

 8      Insurance Company.  I also have Steven Hayes from my

 9      office on the phone.

10           THE COURT:  I appreciate you doing it, but

11      it's easier for me if I do it.  Sam Ferguson for Inns by

12      the Sea?

13           MR. FERGUSON:  Good morning.  Sam Ferguson for

14      Inns by the Sea.

15           THE COURT:  Thank you very much.  Steven Hayes

16      for California Mutual?

17           MR. HAYES:  Good morning, your Honor.

18           THE COURT:  And who is going to be speaking on

19      behalf of California Mutual?  Will it be Mr. Hayes or

20      Mr. Keller?

21           MR. KELLER:  Mr. Keller, your Honor.

22           THE COURT:  Thank you very much.  Mr. Keller

23      on behalf of The Inns by the Sea.

24           MR. REISER:  Good morning, your Honor.

25      Michael Reiser.
```

THE COURT:  And who will be speaking on behalf

     of plaintiffs?

          MR. FERGUSON:  Sam Ferguson of the Meade Law

     Firm will be speaking on behalf of Inns by the Sea as

     plaintiffs.

          THE COURT:  All right.  Thank you so much.  So

     I have gone over what you filed, and let me just start

     by saying the economic damage caused by COVID is just

     heartbreaking, and this case is yet one more of the

     heartbreak.

          There are two things that are of concern to

     me.  It seems to me that the language of the policy

     supported the defendant's position that it talks about

     the business suspension must be caused by direct

     physical loss of or damage to property at the premises,

     and it seems that the cases for the most part are --

     seek to address some sort of physical destruction or

     physical change in usefulness, and I am not sure that

     COVID creates that physical change.

          Now, what I think gives me pause is that I am

     trying to understand the other cases that have been

     referenced by the plaintiffs, and that is that smoke

     damage is considered physical damage, persistent E. Coli

     infestation is physical, gasoline vapors are physical,

     carbon monoxide saturation is physical, and certainly

1   large quantities of asbestos in the air is considered

2   physical.

3           So I am just wondering whether or not COVID is

4   enough like these other things such that it should be

5   covered.

6           So that is sort of my thoughts, and let me

7   just start with Mr. Ferguson.

8           MR. FERGUSON:  Thank you, your Honor.  To

9   directly address your concerns here, I think there is an

10  important way we can view all of the cases you mentioned

11  of smoke damage, E. Coli, gas vapors, carbon monoxide,

12  and one way to view those cases is view the atmosphere

13  in the air within the insured property as part of the

14  physical premises of the property.  I think this is

15  exactly what the *Oregon Shakespeare* case does, which as

16  you mentioned the case of smoke infestation of the

17  *Oregon Shakespeare Festival*, and one way to think about

18  coronavirus, there is actually a contamination of the

19  air within the physical spaces that results in a change

20  on the molecular level of the composition of the air and

21  space.

22          What these cases hold is that when there is a

23  physical change or when there is a physical invasion of

24  a harmful substance that renders a space functionally

25  useless, you have direct physical loss of or damage to

```
 1       property within insurance coverage.

 2              And now, your Honor, I certainly sympathize

 3       with your struggle over whether coronavirus is similar

 4       enough to smoke, E. Coli, gas vapors, carbon monoxides,

 5       and asbestos, but it does seem to me that those concerns

 6       raise a factual question of what are the characteristics

 7       of coronavirus?  How present was it on this premises?

 8       How dangerous was it and what quantities?  Those are all

 9       factual questions that can be addressed in discovery.

10              And with respect to the demurrer, the

11       defendants are making a legal point here.  They are

12       saying under no circumstances does our policy -- does

13       our insurance policy provide coverage for the insured in

14       the absence of tangible alteration to the property.

15              Now, I think as we point out in our brief --

16       and I won't belabor the point -- that is not actually

17       consistent with the language of their own policy, and

18       one of the primary interpretative goals in looking at

19       the insurance policy is you need to make sure that every

20       word in that policy makes sense.  You can't reach an

21       interpretation of a policy that renders superfluous

22       language.

23              To point out the obvious, defendant excludes

24       from coverage the mere presence of bacteria.  Now, that

25       exclusion only makes sense if it is against a backdrop
```

4

1    of damage that goes beyond tangible alteration of the

2    property.  There would be no reason to exclude the

3    presence of bacteria if the policy only covered tangible

4    alteration to property.

5         So, your Honor, I think that addressed your

6    concern, and I will leave it there for now.  I am happy

7    to speak more at length about other issues, but I will

8    leave it there for right now.

9         THE COURT:  Well, let me ask you another

10   question about that.  When I was struggling with the

11   smoke damage, gasoline vapors, et cetera, the

12   distinction in my mind -- and I don't know if this is

13   one that is valid or not, Mr. Ferguson -- the

14   distinction in my mind is that when California shut

15   down, when the Governor ordered us all to shelter in

16   place and businesses to close, it wasn't necessarily

17   because there was COVID at your hotels.  It was because

18   there was a fear that COVID might arrive at your hotels,

19   and there was a fear by having people move around the

20   state, that that would cause us all to infect each

21   other.

22        So even if we assume that COVID infects the

23   air, which I get your point on that, I think the science

24   supports you on that, but I guess the question I have

25   is, was that the cause?

1          MR. FERGUSON:  So, your Honor, to address your

2     concerns here, I think it is important to understand

3     that there are two independent possible sources of

4     coverage here.  The first is the business interruption

5     insurance coverage, which would be triggered by the

6     physical presence of coronavirus on the insured

7     premises.  That is our property, and that is what we

8     allege is our burden to prove that once we get into

9     discovery.

10          But I think on the allegations, we certainly

11     have met the requirements for the complaint that we have

12     alleged that there was coronavirus on the premises,

13     which caused physical loss of or damage to the premises.

14          The other independent source coverage that we

15     have under this policy is civil authority coverage, and

16     that doesn't require that there even be coronavirus on

17     our property.  It merely requires that there is direct

18     physical loss of or damage to property somewhere else,

19     and that the civil authority take action based on the

20     presence of coronavirus on another property.

21          Now the coronavirus is widespread in both of

22     the county orders.  The San Mateo County order and

23     Monterey County order mentioned there is coronavirus

24     virus within both of the counties.  They mention

25     specific case numbers.  They mention case numbers up in

1     the Bay Area.  It is clear in our mind that the local

2     county authority and the Governor are responding to the

3     physical presence of coronavirus in enacting the shelter

4     in place order.

5              And to underscore the point, this is about the

6     physical presence of coronavirus.  I think those orders

7     are designed to require people to avoid direct, physical

8     contact with the virus.  That is the key issue here.

9     150,000 people in this county have died because they

10    have come into physical contact with the virus.

11             I think that the virus is certainly physical,

12    and the orders are in response to the physical presence

13    of the virus that is at other locations and inside the

14    insured premises.

15             THE COURT:  Okay.  So let me make sure I am

16    understanding you.  So the business income is lost

17    because of the civil authority shutdown.  Doesn't that

18    also require a direct physical loss, and don't we still

19    come back to the same problem of whether or not COVID

20    causes a physical loss?

21             MR. FERGUSON:  Yes; that is correct, your

22    Honor.  To trigger the civil authority coverage, it is

23    our burden in discovery to show that there was

24    coronavirus on another property.

25             And what is interesting about the civil

1    authority coverage in this insurance policy is it is

2    written incredibly broadly.  Typically, in other civil

3    authority provisions, there is actually a proximity

4    requirement.  In our case, there actually is no such

5    proximity requirement.

6          So we believe that there was the physical

7    presence of coronavirus that caused a loss of or damage

8    to property essentially anywhere within two counties.

9    And as a result of that, the civil authority within the

10   county's order to ensure premises to be shut down.

11         So when you look at the claim for civil

12   authority in the context of this case and the context of

13   the policy that is in front of you, we think that we

14   sufficiently allege that there is direct physical loss

15   of or damage to other premises, and if we can carry that

16   burden after the demurrer in discovery, then we win this

17   case.

18         But I think all you have to do right now is

19   ask yourself, can the coronavirus cause direct physical

20   loss of or damage to any property?  And again, we would

21   submit that under the 16 cases we cited, the test is

22   whether there is a presence of a hazardous substance,

23   and whether the quantity of that substance renders the

24   property dangerous to human health and renders the

25   property unusable, we think that there is no tangible

8

1    alteration to the property required under this policy.

2            So our burden to invoke code civil authority

3    coverage is to show that somewhere within the County of

4    Monterey or the County of San Mateo that there was

5    coronavirus in such concentration that some property was

6    rendered uninhabitable or unusable because of the

7    concentration of coronavirus.  And we certainly think we

8    can meet that burden in discovery, but for now, the

9    Court has to merely analyze whether we alleged enough to

10   meet that bar.

11           THE COURT:  Thank you.  Mr. Keller?

12           MR. KELLER:  Yes, your Honor.  So I think that

13   your analysis is spot-on and exactly how you should be

14   looking at these issues.  So let me first address the

15   issue that gave you pause.

16           So the courts outside of California, as you

17   mentioned, got into issues like asbestos and carbon

18   monoxide, and those are, as you point out, ultimately

19   not just directed at losses.  It also needs to have the

20   business income loss be caused by that direct physical

21   loss.  Like the carbon monoxide situation, it's,

22   Everybody out of the building.  You are going to die

23   from carbon monoxide.

24           The asbestos, there is direct health problems.

25   There is a smell that is related to a lot of those

1    claims that you are referring to.  And so to have

2    everybody out of the building, that causes the business

3    income loss.

4          Here, the Court need not turn a blind eye to

5    the realities of the pandemic and the business situation

6    where the businesses are open while this pandemic is

7    still ongoing, and that's a result of the fact that it

8    is designed to keep people socially distanced and reduce

9    the spread of the pandemic, and that is why the the

10   shelter is in place so they don't prohibit access of

11   civil authority coverage requires to even allow the

12   hotels to keep people there, which they couldn't in the

13   case of a carbon monoxide, asbestos situation.

14         And further, those cases, again, are outside

15   of California.  The direct physical requirement as

16   prefix to the insurance agreement have to be considered

17   under the context for *MRI Healthcare*, and *MRI Healthcare*

18   says that it's excluded and accompanied by demonstrable

19   physical alteration of the property.

20         So I believe that when you follow the analysis

21   of the policy language under the California case in *MRI*

22   *Healthcare*, that it is not a business income loss caused

23   by direct physical damage to property, and the plaintiff

24   has certainly not alleged that.  At most, they've

25   alleged a physical presence on the property of the virus

1      and not that that has caused the business income loss,

2      nor can they because as I noted, they could have had

3      people there.  They chose to cease and close down based

4      on the counties' orders, and that was the cause of their

5      loss.

6            THE COURT:  Well, let me just correct you.  I

7      don't think they chose to shut down.  They were ordered

8      to shut down.

9            MR. KELLER:  Yes.  They followed the shelter

10     in place orders, and they -- what I meant by that was

11     there was some level of operations that they could have

12     had under the county order such as maybe economically

13     disadvantaged individuals that they still could have

14     provided shelter to.  To completely shut down was not a

15     complete mandate by the counties.

16           But irrespective of that finer point, there is

17     no direct physical damage to property that caused the

18     business income loss.

19           THE COURT:  Well, Mr. Ferguson, I completely

20     disagree with Mr. Keller that anyone had a choice.  I

21     think we were all trying to follow the orders we were

22     given, but in spite of that issue, having looked at the

23     *MRI* case -- and I certainly agree with your

24     representation that once you get to the facts of the *MRI*

25     and the ramping up, the ramping down and all that, it

1          really is not at all like our case here.

         2                  However, I do think -- and help me with this,

         3          Mr. Ferguson -- I do think the *MRI* case is intended to

         4          be the framework by which we analyze these cases, and

         5          that case pretty much says that because of the need for

         6          a physical damage, that it precludes any claim in which

         7          the insured suffered a detrimental economic impact

         8          without the distinct, demonstrable physical alteration

         9          of the property.  Help me out with that, Mr. Ferguson.

        10                  MR. FERGUSON:  Yes.  So a couple points on

        11          *MRI*, your Honor.  First, the term 'physical, as the *MRI*

        12          court understands it is, losses that are intangible or

        13          incorporeal.  That is what it is using to distinguish

        14          against physical, and I don't think that we alleged an

        15          intangible or incorporeal loss here.

        16                  We allege there are specific, physical

        17          microbes within our property that are contaminating the

        18          air that are hazardous to human health that are

        19          rendering it unusable.  And I think to adopt the

        20          definition of direct physical loss of or direct physical

        21          damage to property, that it excludes the situation where

        22          you have an invasion by a physical force into the

        23          atmosphere of your property onto all the surfaces of

        24          your property and says that is not direct physical loss

        25          of or damage to property, it can't be the case.

                                                                        12

1           When an insured purchased insurance, they are

        2    expecting that when there is a physical catastrophe that

        3    shuts down their operation, the insurance coverage will

        4    kick in and cover that, and I think that to the extent

        5    that *MRI* case suggests that there has to be tangible

        6    alteration in the sense that it is perceptible to the

        7    eye or to touch, that is simply dicta in that case.

        8    This Court is not required to follow *MRI Healthcare* on

        9    that rationale.

       10           *MRI Healthcare* actually could have said what

       11    we are saying here.  It could have said physical damage

       12    actually does include the physical invasion by hazardous

       13    substances that renders a property unusable, and the

       14    outcome would have been exactly the same in *MRI*

       15    *Healthcare*, and I am pointing that out to say that

       16    discussion of the meaning of direct physical loss of or

       17    damage to property wasn't central.

       18           One other point about *MRI Healthcare* is the

       19    language of coverage in that case and the relevant

       20    policy is actually different.  The language of coverage

       21    in that policy, direct physical loss to or damage to

       22    property.  In our case, it is direct physical loss

       23    of...property, and we think that difference in language

       24    is critical as we have suffered a direct physical loss

       25    of our property because it's been invaded, contaminated,

1   polluted by the hazardous substance that renders it

2   unfit for human use, and the government saw the same

3   hazard was present and ordered us to shut down our

4   operations as a consequence of that.

5          And, your Honor, I think you previously had

6   characterized the shutdown orders as requiring people to

7   distance.  And while that is part of the orders, they

8   actually do go further than that, and this is critical.

9   This is paragraph three of the Monterey order:  All

10  businesses within the facility in the county except

11  essential businesses are required to cease all activity

12  at facilities located within the county.  That is a

13  direct shutdown and a closure of our business that

14  prohibits access to the business, which we think is

15  enough to trigger the civil authority coverage.

16         Mr. Keller has made the point that there were

17  very specific uses that we could have made about

18  properties under these orders.  We could have sheltered

19  homeless people and possibly allowed a limited number of

20  individuals to use the hotel as a residence.

21         What he is trying to do is read into the civil

22  authority provision in our policy of requiring that

23  there be a total prohibition of access to the insured

24  premises.  Well, that word 'total' doesn't actually

25  appear in our insurance policy.  All it says is the

1    government prohibits access to your premises and has

2    done so as a consequence of a direct physical loss of or

3    damage to the properties elsewhere, then insurance

4    coverage kicks in.

5           I hope that addresses your concerns about *MRI*,

6    your Honor.

7           THE COURT:  It is helpful.  Thank you.

8    Mr. Keller, anything you would like to close with?

9           MR. KELLER:  Yes, your Honor.  So at the end

10   of the day, the virus, whether it is present on the

11   property or not, does not cause the business income

12   loss, which it is required to under the policy, and it

13   is not a direct physical loss as -- not a direct

14   physical damage to property as described by *MRI*

15   *Healthcare*.

16          And at the end of the day, they cannot allege

17   that there was a direct physical damage to property that

18   was, in fact, the cause of their business income loss.

19   Thank you.

20          THE COURT:  Any last words, Mr. Ferguson?

21          MR. FERGUSON:  Yes, your Honor.  Thank you.

22   One last word is, I would urge the Court to reread *Ward*,

23   which is the other case that California Mutual cites

24   with the idea that you need a tangible alteration.

25          But what is critical in the *Ward* case is that

1    you have to analyze the scope of coverage within the

2    context of the claims that are asserted.  And so, you

3    know, language that might appear unambiguous in the

4    context of one particular claim might eventually appear

5    ambiguous in the context of another claim.

6           So the two cases the defendant cites, *Ward* and

7    *MRI*, are in such different factual circumstances of

8    their own that I think, given the claims that we are

9    asserting, the scope of the coverage within the policy

10   has to be viewed within the lens of the claims that we

11   are asserting.

12          And given the claims that we are asserting, I

13   think that the insurance policy is, at a minimum,

14   subject to two reasonable constructions.  One is that as

15   the defendants assert that there has to be physical

16   alteration to the property.  The other is the

17   construction.

18          We think this is a reasonable interpretation,

19   and given the Court's struggle with how to resolve this

20   case, we think it's clear that reasonable minds can

21   differ on this.  If that is the case, the tie goes to

22   the plaintiff as ambiguities are construed in favor of

23   the insured.

24          And, your Honor, one last point.  California

25   Mutual actually has a virus exclusion that they include

1    in other policies.  We raised this in the complaint.  In

2    fact, in their reply, they cite the *Michigan* case where

3    the insurance policy issue in that case also had a virus

4    exclusion.  This is a well-known exclusion that is

5    included in many, many, many policies throughout the

6    country, and many of the cases in the wave of COVID

7    litigation in the last few months are going to be

8    decided on that virus exclusion angle.

9           Our client has dutifully paid almost $40,000 a

10    a year in insurance premiums to California Mutual under

11    a policy that does not have a virus exclusion.  This is

12    critical, your Honor.  The fact that California Mutual

13    and the insurance industry at large has a virus

14    exclusion very strongly suggests to us that they believe

15    a virus -- the presence of a virus can cause direct

16    physical loss of or damage to property.  That was not

17    included in this policy.

18           California Mutual very easily could have

19    tacked on the word 'virus' using a comma after the word

20    'bacteria' in the bacteria exclusion.  They could have

21    included the presence of virus from the insurance

22    policy, and they failed to do so.

23           So California Mutual having failed to define

24    the central term in this case, direct physical loss of

25    or damage to property, and having failed to include a

1   virus exclusion, we think the Court should adopt the

2   plaintiff's very reasonable construction of this

3   insurance policy and find that our allegation that there

4   is physical presence of coronavirus and hazardous

5   concentration on our property is sufficient to trigger

6   business income interruption insurance coverage, as well

7   as the fact that there is coronavirus-inhabited

8   concentration on other properties triggered the

9   government to close our facilities.

10          Or in the alternative, we are also entitled to

11  civil authority coverage.  And I think with that, your

12  Honor, we would submit.

13          THE COURT:  All right.  The Court is going to

14  take this under submission.  It seems to me that if the

15  Court decides to sustain the demurrer, that the motion

16  to strike is moot, so I don't want to hear argument on

17  that.

18          Anyway, I just want to spend more time

19  thinking about it, and I appreciate your thoughtful

20  argument.  If for any reason I decide that I need

21  additional argument, I will let you know, but otherwise,

22  I hopefully will be able to let you know very soon.

23  Thank you.

24          MR. FERGUSON:  Thank you, your Honor.

25          MR. KELLER:  Thank you, your Honor.

```
 1            MR. FERGUSON:  Should there be any additional

 2    briefing or legal issues you should like us to address,

 3    we would be happy to do so.

 4            THE COURT:  This is Mr. Ferguson talking?

 5            MR. FERGUSON:  I am sorry.  Mr. Ferguson, yes,

 6    your Honor.

 7            THE COURT:  Thank you very much.

 8            (Whereupon, the proceedings adjourned at 9:55

 9            a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1    STATE OF CALIFORNIA      )

2                             ) SS.

3    COUNTY OF MONTEREY       )

4

5            I, Jamie L. Setterquist, an official reporter

6    for the Superior Court of the State of California, in

7    and for the County of Monterey, do hereby certify:

8            That, as such reporter, I reported

9    stenographically the above proceedings on Monday, August

10   4, 2020, and that the above and foregoing transcript,

11   consisting of pages numbered from 1 to 19, inclusive,

12   contain a true and correct transcript of all of said

13   proceedings.

14

15           Dated at Salinas, California, this August 7,

16   2020.

17

18

19                        _____
                          JAMIE L. SETTERQUIST   CSR 13362
20                        OFFICIAL COURT REPORTER

21

22

23

24

25
```

JAMIE L. SETTERQUIST   CSR 13362

1  STEPHEN M. HAYES (SBN 83583)
   RYAN Z. KELLER (SBN 249193)
2  HAYES SCOTT BONINO & ELLINGSON
   GUSLANI SIMONSON & CLAUSE, LLP
3  999 Skyway Road, Suite 310
   San Carlos, California 94070
4  Telephone: (650) 637-9100
   Facsimile: (650) 637-8071
5
6  Attorneys for Defendant,
   CALIFORNIA MUTUAL INSURANCE COMPANY
7

ELECTRONICALLY FILED BY
Superior Court of California,
County of Monterey
On 8/06/2020
By Deputy: Cummings, Lorielle

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 IN AND FOR THE COUNTY OF MONTEREY

10  THE INNS BY THE SEA, a California          CASE NO. 20CV001274
    Corporation,
11
            Plaintiff,
12                                             **[PROPOSED] ORDER GRANTING**
    v.                                         **DEFENDANT CALIFORNIA MUTUAL**
13                                             **INSURANCE COMPANY'S DEMURRER**
                                               **TO PLAINTIFF'S COMPLAINT**
14  CALIFORNIA MUTUAL INSURANCE
    COMPANY, a California Corporation, and      **MATTER DEEMED COMPLEX, and**
15  DOES 1 through 25, Inclusive,              **assigned for All Purposes to Judge Lydia M.**
                                               **Villareal**
16          Defendants.
                                               Hearing Date:    **August 4, 2020**
17                                             Time:            **8:30 a.m.**
                                               Dept.:           **13**
18
                                               Action Filed:    **April 20, 2020**
19                                             Trial:           **None Set**
20
21
22
23
24
25
26
27
28

1138634

Defendant CALIFORNIA MUTUAL INSURANCE COMPANY's ("California Mutual") Demurrer to the Complaint filed by Plaintiff The Inns by the Sea ("Plaintiff") came before the Honorable Lydia M. Villarreal in Department 13 on <u>August 4</u>, 2020. The Court, having reviewed the papers filed in support of and in opposition to, and good cause appearing therefor, the Court hereby makes the following orders:

1.      IT IS HEREBY ORDERED that the California Mutual's Demurrer to Plaintiff's <u>entire Complaint</u> is sustained without leave to amend on the grounds that the allegations fail to state facts sufficient to constitute a cause of action.

**IT IS SO ORDERED**.

Dated: **August 6, 2020**, 2020        _____

Judge Lydia M. Villarreal
Judge of the Superior Court of Monterey