# EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MAXINE M. CHESNEY, JUDGE

| | |
|---|---|
| MORTAR AND PESTLE CORP. d/b/a ) OLEA RESTAURANT, ) ) Plaintiff, ) ) VS. ) ) ATAIN SPECIALTY INSURANCE ) COMPANY a/k/a ATAIN INSURANCE ) COMPANY, ) ) Defendant. ) _____ ) | **No. C 20-3461 MMC**<br><br><br><br><br><br><br><br>San Francisco, California<br>Friday, September 11, 2020 |

**TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**:  (via Zoom Video Conferencing)

For Plaintiff:

        LEVIN SEDRAN & BERMAN LLP
        510 Walnut Street, Suite 500
        Philadelphia, Pennsylvania 19106-3697
        **BY:  DANIEL LEVIN, ESQ.**

For Defendant:

        MOKRI VANIS & JONES, LLP
        4100 Newport Place, Suite 840
        Newport Beach, California 92660
        **BY:  GAILANN Y. STARGARDTER, ESQ.**

Reported By:   Katherine Powell Sullivan, CSR #5812, CRR, RMR
                 Official Reporter - U.S. District Court

EXHIBIT L-1

<u>**Friday - September 11, 2020**</u>                    <u>**9:01 a.m.**</u>

## P R O C E E D I N G S

     **THE COURT:**  Well, we're proceeding by a Zoom hearing
process.  I'm not in the courtroom, actually.  This is a
virtual background.  And if I move around and it starts to
blur, I may just switch out of this background because some of
handmade virtual backgrounds do weird things.

     All right.  So we're proceeding now in the hearing of
Mortar and Pestle Corp. dba -- is it pronounced Olea?  Is it
pronounced Olea or Olea?

          **MR. LEVIN:**  I pronounce it Olea.

          **THE COURT:**  Very good.

          **MR. LEVIN:**  That's my understanding, Your Honor.

          **THE COURT:**  All right.  So Mortar and Pestle Corp. dba
Olea, which is a restaurant, versus Atain Specialty Insurance
Company.  I'd like counsel to state their appearances for the
record, please, starting with plaintiff's counsel.

          **MR. LEVIN:**  Daniel Levin, of Levin Sedran & Berman,
for plaintiff.

          **THE COURT:**  Thank you.  And for the defendant.

          **MS. STARGARDTER:**  Good morning, Your Honor.  Gail
Stargardter for Atain Specialty Insurance Company.

          **THE COURT:**  Thank you very much.

     We have a reporter, Ms. Sullivan.  And, also, I believe
that my courtroom deputy clerk is participating.  She said her

EXHIBIT L-2

video didn't work, but I don't see anything indicating she's here at all. Ms. Geiger, can you hear me?

          **THE CLERK:** Yes, I can, Your Honor.

          **THE COURT:** Oh, I see. You're a large court seal.

          **THE CLERK:** Yes.

          **THE COURT:** All right. Fine. Thank you very much. Okay. So we're going to proceed. Why am I having the hearing, particularly when it's difficult to do this?

I think this is -- I just want to say at the beginning, Mr. Levin, it's a hard argument for the plaintiff, given the particular policy language here, but I very much recognize the difficulties that have been heaped on businesses during the COVID pandemic, particularly small businesses, restaurants in great part. Olea is a small restaurant.

I want to make sure that I have everything in front of me so that whichever way I go on this there's not a question in my mind that anybody left anything out either for the plaintiff's standpoint or the defendant's.

There's been quite a bit of litigation already around the country, as you both know, concerning this particular subject. It is a matter of real concern to a lot of people.

So I guess I could just go through, first of all, the papers that I have from you. I want to make sure that I'm not missing anything. I have the defendant's motion to dismiss. I have the plaintiff's response, which is in opposition. I have

EXHIBIT L-3

the reply.  I also have a Statement of Recent Decision from the defendant, that was from Judge Wilson out of the Central District of california.

And there's a request for judicial notice.  To my understanding that is not opposed in any way, but I did want to just confirm that with you, Mr. Levin.

**MR. LEVIN:**  That is Correct, Your Honor.

**THE COURT:**  Okay.  Thank you.

And then I have a couple of proposed orders because the Local Rules required you to give them to me.  So I have one from the plaintiff that basically says sorry, you lose.  Then I have one from the defendant that says more than, sorry, we win. But when you get right down to it, after you get through all the background facts, essentially the conclusion is you're not covered, we win; and even if you were covered, you're excluded after we get through with the policy.

So that's where we are.  I'm -- I'm familiar with the language that we have here.  I was wondering, Mr. Levin, is there anything you can add to it, at this time, that you didn't have when you filed the complaint initially?

**MR. LEVIN:**  Any additional information?

**THE COURT:**  Yeah, any new facts or anything that you could plead legitimately under Rule 11.

**MR. LEVIN:**  Your Honor, if Your Honor does not believe that we pleaded physical damage, we would request permission to

EXHIBIT L-4

1  add additional allegations that would, in our opinion,

2  demonstrate physical damage or loss under the policy that would

3  trigger coverage.  And if I could --

4          **THE COURT:**  Keep going.

5          **MR. LEVIN:**  Part of our damage is that the virus is a

6  physical substance that we all know, from orders throughout

7  this country, can contaminate a property and expose individuals

8  to risk of serious injury.  That contamination to the property,

9  we believe, causes physical damage to the property by not

10 allowing the insured to operate that property for its intended

11 purpose.

12     It would be similar to a circumstance where if you had a

13 portion of your building damaged.  That doesn't mean -- maybe

14 you can enter the basement and work in the basement.  But when

15 a physical -- there's physical damage to part of the building,

16 that would trigger damages, physical loss or use under the

17 policy.

18     We believe, as a result of the pandemic, that the virus is

19 causing physical damage.  It is a substance -- I'm not a

20 scientist, but it has molecules, it is a substance that

21 contaminates the property and causes damage to that property in

22 a way that allows -- doesn't allow the restaurant owner to use

23 that property for its intended purpose.  It can't be used.

24 It's not safe to be used.  And we believe that is a physical

25 damage under the policy.

EXHIBIT L-5

1      **THE COURT:**  Well, is that the kind of language you

2  would plan to add, or would there be any, I don't know, unique

3  facts pertaining to this particular restaurant?

4      **MR. LEVIN:**  That would be the type of language, Your

5  Honor, that we would add.

6      **THE COURT:**  Okay.  All right.  More descriptive of

7  what the coronavirus is that you may not have put in the

8  complaint itself.

9      **MR. LEVIN:**  Correct, Your Honor.

10      **THE COURT:**  Okay.  Let's go over this a little bit and

11  see.  The operative language, as I understand it in the policy,

12  is that the company will pay for direct physical loss of or

13  damage to covered property.

14      And then there's an endorsement that has an exclusion for

15  fungi, spores, bacteria or viruses.  That's very broadly

16  worded.  It goes on at great length in an effort to cover all,

17  I guess, at least to the insurance company, imaginable ways

18  that somebody could plead a claim based on a virus or spores or

19  bacteria.

20      A couple of points.  The fact that a term isn't defined in

21  the policy, as I understand it under the law in California,

22  doesn't mean it's ambiguous.  And if it has been construed by

23  an Appellate Court in California, that's ordinarily deemed to

24  clear up any potential arguable ambiguity.

25      In that regard, the defendant is relying on *MRI*, a case

EXHIBIT L-6

involving, not surprisingly, an MRI.  So *MRI Healthcare Versus State Farm*.  It's about a 10-year-old case.  To my knowledge, it has not been in any way reversed, distinguished in a way that would affect us in any fashion.  It's been followed.

I think the defendant pointed out a Court in Florida.  This Court ended up following it fairly recently.  But, in any event, that court had held -- I'll just quote them, There must be a distinct demonstrable physical alteration of the policy, closed quote.  And they also said, essentially, that it has to be, quote, damaged within the common understanding of that term.

So in that case there was an MRI machine and there was some kind of leaking or whatever above.  And they turned it off, and when they tried to turn it on again it wouldn't work.  They said, okay, that's a physical loss.  And the Court said no.

Now, the plaintiff has given us a number of cases.  Mr. Levin, you gave us *Armstrong World Industries*.  The *Studio 417* I'll get back to in a minute.  *In re Chinese Manufactured Drywall*, *Western Fire Insurance*.  So a number of cases that have, at least one could say, appeared to have expanded a little bit the idea that something doesn't have to just burn down or be drenched in water to the point it can't be used but, rather, that the injury could be a little bit more broadly interpreted under language like we have here.  Either

EXHIBIT L-7

1   exactly the same or not materially different.

2       So how about these asbestos fibers?  They were embedded in

3   the property.  And to make that property usable again you had

4   to pull it out because they were -- apparently, the asbestos

5   material was causing fibers to get into the building, so it was

6   uninhabitable.

7       And then there was -- I think the broadest one is where

8   the land eroded under the house, so the house looked pretty

9   good but it could fall down at any moment.  So that one still

10   was found to be within coverage.

11       Then you had the drywall that was releasing gas and made

12   the place uninhabitable.  And they said, okay, that's a

13   physical loss.

14       Gasoline that leaked under the church, the Presbyterian

15   church.  And apparently, though, the Court had said there

16   wasn't a direct physical loss until that gasoline had actually

17   infiltrated and contaminated the foundation and the walls in

18   the rooms, not that it was just kind of sitting under it

19   quiescently.

20       So if you were trying to analogize our case to those

21   cases, where's the physical intrusion, so to speak, that we

22   have here, Mr. Levin?

23       **MR. LEVIN:**  Well, we believe the virus is in the

24   building.  And we would plead that.  And we would respectfully

25   request, Your Honor, the opportunity to present a record of

EXHIBIT L-8

1   that, present evidence.

2       And that's one of our arguments in our brief, is that it's

3   premature, at this moment, to dismiss our claim as not

4   triggering coverage based on the statements by defendant that

5   there's no physical damage when the Court didn't -- does not

6   have a record, as those other cases did, where the plaintiff

7   either met that burden or did not meet that burden.

8       We would respectfully request the opportunity to develop a

9   record that the virus is -- this pandemic is causing

10   contamination to the property, which would trigger coverage for

11   physical damage.

12       And a lot of these cases -- and we cite to

13   (unintelligible) insurance -- there's a distinction of the

14   fortuitous event of this. The plaintiff, unlike in the *MRI*,

15   did not bring that product into the building and -- and that

16   would cause the damage. This is something that was not brought

17   in by plaintiff. It's much like the gasoline or the -- it's

18   the contamination is the fortuitous event.

19       And we believe, given the opportunity, we can through

20   expert testimony and a record identify and demonstrate physical

21   loss which would trigger coverage under the policy.

22       **THE COURT:** Okay. The one case that you have that's

23   directly on point, if you will, would be *Studio 417 versus*

24   *Cincinnati Insurance*. That case is a case that was decided by

25   a state court in the state of Missouri. Or "Missoura" if

EXHIBIT L-9

1   you're from there.

2         **MR. LEVIN:**  It's -- Your Honor, sorry to interrupt.

3   It is the Western District of --

4         **THE COURT:**  Oh, that was Western District.  I'm sorry.

5   You're absolutely right.  Sorry.  But under Missouri state law.

6         **MR. LEVIN:**  Correct.

7         **THE COURT:**  Okay.  And so -- as all insurance,

8   essentially, is under state law, or pretty much so.

9         So in that case they did have a stay-at-home order like we

10  have.  In other words, this is as close as the plaintiff is

11  going to get to a case that helps them.

12        The defendant's response, by the way, to *Studio 417* was

13  pretty brief.  It boiled down to, that's Missouri, we're in

14  California.  And that's true.

15        Also, I have some question about where the Court, perhaps,

16  went farther than the cases it relied on.  It collected up,

17  again, the cases we've been talking about that the plaintiff

18  has provided, where courts have found damage when the

19  structure, if you just looked at it, looked okay, but it was

20  creating problems, and somebody was going to have to either rip

21  it out, tear it down, or do something or the place was not

22  going to be usable.  And I think that the Court went further

23  than those cases in finding the damage, at least on the record

24  that they had there.

25        It's possible that you may be able to add more.

EXHIBIT L-10

1    Let me go back, for a moment, to Ms. Stargardter and see

2  if she wants to respond at all to the reliance on the cases

3  that *Studio 417* felt took that plaintiff into a point of

4  coverage.

5    **MS. STARGARDTER:**  Thank you, Your Honor.

6    My reading of the 417 -- *Studio 417* case is that it talks

7  about the virus attaching to the property and depriving the

8  plaintiffs of their use of the property.

9    But that is not the definition of direct physical loss or

10 damage in California.  It isn't loss -- for loss of use of

11 property to be direct physical loss, it has to mean that the

12 plaintiff is permanently deprived of their property, not that

13 it's a temporary loss of use.  And I think that's the -- that

14 is the distinction between the two cases.  Or that case and the

15 case -- or the facts of our case.

16    And building on that, when you look at the *Port Authority*

17 case and the *Western Fire* case, what *Port Authority* says is

18 that when -- when the damage to the building isn't observable

19 to the naked eye, that the plaintiff has to meet a higher

20 threshold and they have to show that either the building or the

21 property itself has completely lost its functionality.

22    *Western Fire* says the same thing.  And, as Your Honor

23 correctly pointed out, what the *Western Fire* court says is

24 that, again, the loss of use has to be the complete loss of

25 use.  And that loss of use doesn't occur until the property

EXHIBIT L-11

1    cannot be used again.

2        Following on that, the *Mama Jo's Inc. versus Sparta* case

3    says that when -- and, again, citing the definition of direct

4    physical loss or damage used in *MRI* says that when property can

5    be restored to its functionality through the use of routine

6    maintenance, there is no direct physical loss or damage.

7        And what the evidence is, including the evidence presented

8    in plaintiff's own opening -- I'm sorry, in plaintiff's

9    complaint, is that you can take everyday household cleaner and

10   wipe down the property and the virus is gone.  It doesn't

11   change the physical structure of the property.  It doesn't

12   alter the property.  It doesn't damage the property.  And, in

13   fact, if -- if COVID-19 did that, none of us could live in our

14   homes.  So loss of use is not direct physical loss or damage in

15   the first-party context under California law.

16       And that also applies as to why the *Armstrong* decision and

17   the *Thee Sombrero* decision are inapposite, because they're

18   duty-to-defend cases.  And under duty to defend, the definition

19   of property damage is "or loss of use of tangible property that

20   has not been damaged."  So it's a completely different

21   definition.

22       Turning back to *Hughes versus Potomac*, in that instance

23   there's a couple of things.  First of all, the house itself did

24   sustain damage.  There was damage to the property.  It was

25   minimal damage, but there was actual physical property damage

EXHIBIT L-12

1  to the house.

2      And what the Court held in that case is that the loss of

3  the lateral support caused by the erosion, the physical change

4  in the land under the house, was again property damage.

5      And the only question really answered by the Court in

6  *Hughes versus Potomac* was whether the loss of the land --

7  whether the land under the home was covered property.

8          THE COURT:  Okay.

9          MS. STARGARDTER:  They didn't talk about -- the issue

10 wasn't really -- they didn't focus so much on direct physical

11 loss.  They said, yeah, it sustained direct physical loss

12 because it had moved and eroded and had changed.

13     What the Court held was that because the policy didn't

14 exclude land from the definition of covered property, in

15 addition to paying for the structural damage to the house and

16 the damage to the personal property in the house the insurance

17 company also had to pay to restore the lateral support to the

18 house.

19         THE COURT:  Okay.  Did you want to keep going?

20         MS. STARGARDTER:  I don't want to --

21     (Audio interruption)

22         MS. STARGARDTER:  I think all of the cases cited are

23 easily distinguishable.

24         THE COURT:  Let me stop you for a moment.

25     All right.  I don't know what happened, but at some point

EXHIBIT L-13

1  while you were speaking just a moment or two there was a

2  recorded voice that said "The recording has stopped."  Now,

3  just a moment ago it said "This meeting is being recorded."  So

4  I don't know what exactly the story is here.

5       Okay.  I had mentioned a few cases that the plaintiff had

6  relied on.  You were going further to cite other cases, which

7  is fine.  *Mama Jo's* is the case I was mentioning out of Florida

8  that it cited *MRI* and the definition that was in that -- that

9  was in *MRI*.

10      *Mama Jo's* did say that construction work dust that had to

11 be cleaned off didn't count as damage as long as you just wipe

12 it off.  And there was a pretty hefty cleaning bill, in around

13 a 16-, $17,000 cleaning bill to get rid of the dust that they

14 submitted to the insurance company.  And that Court said, okay,

15 you could clean it off, so that's not damage.  And we -- that's

16 in Florida, so we don't necessarily have a case exactly like

17 that here.  But it has some of the similarities, I guess you

18 could say.

19      Okay.  Did you want to keep going?  I just wanted to stop

20 you for a moment while we tried to figure out why we were

21 getting a recorded voice.  But you may have covered everything

22 you wanted to cover already.

23      **MS. STARGARDTER:**  I think I did cover -- I think the

24 other distinction is in the *Chinese Drywall* case.  Again, it's

25 a -- in that case the Court did find that there was -- the dust

EXHIBIT L-14

and the debris from the drywall also caused physical damage to other portions of the building.  So, again, I think they're all distinguishable.

I didn't know if you wanted me to talk about the virus exclusion at this point in time.

**THE COURT:**  No.

**MS. STARGARDTER:**  Okay.

**THE COURT:**  We hadn't gotten to that yet.  We're still talking about whether or not there's coverage under the main part of the policy, before we get to the endorsement.  And I have a few questions I want to ask about the arguments and responses that were raised more or less as a kind of legal matter regarding the endorsement.

Okay.  There have been a number of cases out of this District that have found under language, again, quite similar that there was no coverage.  I don't know that you gave me any of these, Counsel, so I'll just tell you about them, where they're from.

One of them we know about.  That's the *10e* case that Judge Wilson, in the Central District of California, recently decided.  And, by the way, that was on a motion to dismiss.

I don't remember on *Mama Jo's* if that was a motion to dismiss or not.  Let me take a look at that.  I can't tell.  No, it's a summary judgment.

Most of the cases have been summary judgment.  But we do

EXHIBIT L-15

1    have a number of cases, in any event, from out of the area that

2    were on COVID beside Judge Wilson's case.  And not all of those

3    were summary judgment.  I'd have to double-check again to see.

4    I thought I had a note of this, but I guess I don't.

5        Yeah, motion to dismiss on -- the first one I'm going to

6    give you is *Diesel Barbershop versus State Farm*.  That's at

7    2020 WL 4724305.  It's out of the Western District of Texas

8    earlier this -- earlier -- not this month, it was in

9    mid-August.  Let me take that back.

10       Then there's a case called *Roses 1* -- 1 is a numeral --

11   *versus Erie Insurance Exchange*.  That was a summary judgment

12   motion.  And let me give you the cite on that.  2020 WL

13   4589206, from the Superior Court of the District of Columbia.

14   That was August 6 of 2020.

15       Then there's a case called *Gavrilides* -- I'll spell it for

16   the reporter; G-a-v-r-i-l-i-d-e-s -- *versus Michigan Insurance*.

17   Michigan Circuit Court July of this year.  That's 2020

18   WL 4571957.  And let me see.  That was a -- their equivalent, I

19   would say, of summary judgment.  It's called summary

20   disposition.

21       So those cases all found language like ours, or almost

22   like ours, did not cover claims for shutdown during COVID.

23   None of them, again, is a case out of California of course.  So

24   they're decided under the law of the states in which they were

25   located.

EXHIBIT L-16

1      And we already mentioned the *10e LLC v. Travelers*.

2      All right.  So there seems to be a kind of, you know, wave

3   of cases going contrary to the plaintiff's position on

4   coverage.  I don't know how much can be added.

5      Is the restaurant open at all, by the way, Mr. Levin?

6          **MR. LEVIN:**  Limited capacity.

7          **THE COURT:**  On the weekends, is that it?

8          **MR. LEVIN:**  Yes.

9          **THE COURT:**  Okay.

10          **MR. LEVIN:**  May I address those cases, Your Honor?

11          **THE COURT:**  Sure, yeah.  Yes.

12          **MR. LEVIN:**  I think as this case evolved, some of the

13   arguments have evolved as well.  And I -- I know for some of

14   those cases the plaintiff was not alleging/arguing that there

15   was physical damage to the property.

16      In the Michigan case I know specifically they were arguing

17   under a civil authority order triggered coverage and conceded

18   there was not property damage.  We disagree with that

19   interpretation by plaintiff.  But that -- that concession was

20   dispositive in the Court's ruling, that concession that there

21   wasn't physical damage.

22          **THE COURT:**  Okay.

23          **MR. LEVIN:**  Therefore, they didn't have a covered loss

24   under the policy because they conceded that they didn't have a

25   physical loss.  So I think that case can be distinguished

EXHIBIT L-17

simply by the fact that the plaintiff conceded it didn't have physical loss. We don't agree with that.

And, Your Honor, I -- I can't emphasize more, we want the opportunity to present evidence of physical loss. Defendant claims we don't have physical damage because we don't have physical damage because virus doesn't cause physical damage.

There is not a record before this Court where you -- where we can make that finding. We haven't presented evidence that there is physical damage. Defendant hasn't presented any evidence that there is not. We haven't been given that opportunity.

THE COURT: Okay.

MR. LEVIN: We simply think it's premature, at this time, to offer that kind of conclusion.

Now, for the *Chinese Drywall* and the other cases and the gasoline case that Your Honor spoke of, when the property is in such -- where it's not habitable for its use, the courts have, when presented evidence of that type of harm, have found property damage.

We believe in this case that we can meet that burden. Maybe defendant will give -- be provided the opportunity to also submit evidence that we can't. Our argument is, at this time it's premature to find as a matter of law that we cannot prove property damage under the policy.

THE COURT: Okay. Let me --

EXHIBIT L-18

1    **MS. STARGARDTER:**  Your Honor, may I just add one

2    little point?

3    **THE COURT:**  Yes.

4    **MS. STARGARDTER:**  In order for the civil authority

5    coverage to apply, the stay-at-home order has to be issued

6    because of property damage to premises near the insured

7    premises.  The fundamental problem with plaintiff's argument is

8    that the stay-at-home order isn't -- it was never issued

9    because of property damage.  The order is issued to prevent the

10   spread of virus from person to person.

11   **MR. LEVIN:**  Well, I --

12   **MS. STARGARDTER:**  So I think that's a critical

13   distinction.  On that basis alone the loss does not fall within

14   the scope of the insuring agreement.

15   **THE COURT:**  You want to respond to that, Mr. Levin?

16   Then I want to go --

17   **MR. LEVIN:**  We believe that the civil authority orders

18   were developed to prevent the spread of COVID, but, also -- and

19   I think we argued that it does cause property damage.  We cite

20   to the Pennsylvania Supreme Court, the New York Civil

21   Authority.  So I agree with defendant that the civil authority

22   order and the covered loss do -- there is a -- they both kind

23   of fit together.  But I don't agree that the civil authority

24   was not intended to protect property damage and -- and personal

25   injury loss to the public.

EXHIBIT L-19

1       **THE COURT:**  All right.  Let's go to the exclusion for

2  a minute.

3       You, Mr. Levin, had raised a variety of challenges.  One

4  had to do with whether or not there's some regulatory estoppel

5  because the representative of the insurance groups, the ISO,

6  may not have interpreted for the Insurance Department the

7  exclusion in the way they're using it now.

8       And the response to all that from the defendant was, we're

9  not part of that group, we are -- you know, we're a secondary

10  carrier, we don't have to submit anything to the Department,

11  and we didn't, and this is our own creation.

12       Do you have any response to that?

13       **MR. LEVIN:**  Your Honor, the genesis of how the virus

14  exclusion was developed by the defendant, whether it was done

15  by the ISO, who got it approved, or in the defendant's case

16  where they may have adopted what the ISO got approved by the

17  Insurance Department and, you know, as they say the rider they

18  had attorneys draft and put it in the policy, and they didn't

19  have to get it approved, but the whole genesis of how it was

20  created, even if it was done by their own lawyers, we believe

21  under California law we're entitled to evidence of how this

22  policy was -- this language was developed to demonstrate that

23  there is ambiguity in it.

24       And what I would point out, Your Honor, is -- and we cite

25  to it in our brief.  It's *Meyer National Foods v. Liberty*

EXHIBIT L-20

1　*Mutual Fire Insurance Company* -- other insurance policies that

2　have this virus exclusion discuss the pandemic in it.  This

3　particular one doesn't.

4　　　And we also know from -- it's -- this case, Your Honor,

5　was not cited in our briefs, but I -- *Montrose Chemical v.*

6　*Admiral*, 10 Cal.4th 645, at page 670.  It's a Supreme Court of

7　California case, 1995, where the Court, you know, was going to

8　look at how these policies were drafted to determine whether,

9　you know, there was ambiguity in it.

10　　　In other words, it may -- the policy may look clear on its

11　face, but there may be ambiguity based on different insurance

12　policies that are in the industry.  I just cited the case in

13　*Meyer National Foods*, which is on page 14, I believe, of our

14　brief, where the policy in that instance identified a pandemic.

15　It specifically identified a pandemic.  But in our particular

16　case there is no mention of a pandemic.

17　　　We -- this is similar to our property damage argument.  We

18　believe that we should be entitled to discovery to show what we

19　believe is the true meaning of the policy and the intent of the

20　parties under California law.  There is case law and California

21　law that's cited in our brief that just because a policy on its

22　face may look straightforward, that doesn't mean thatthere

23　isn't ambiguity in it.  And the Court is well within its right

24　to look outside of that policy.  And that's simply what we're

25　asking the Court the opportunity to do.

EXHIBIT L-21

1    **THE COURT:**  Okay.  Could I -- could I -- excuse me.

2    Could I get the cite again?  10 what was it?  *Montrose*.

3    **MR. LEVIN:**  I'm sorry.  Cal.4th 645.

4    **THE COURT:**  Okay.  It's a Cal -- excuse me.  It's a

5    Cal --

6    **MR. LEVIN:**  Supreme Court.

7    **THE COURT:**  Okay.  10 Cal.4th.  That's 645 at 670;

8    correct?

9    **MR. LEVIN:**  The name of the case, just in case I can't

10   read my handwriting, is *Montrose Chemical v. Admiral*.

11   **THE COURT:**  I got that part.  Thank you.  You just

12   kind of -- you were spelling out the citation, which you

13   started to do again, and that was throwing me off.

14   **MR. LEVIN:**  I apologize, Your Honor.

15   **THE COURT:**  Okay.  Thank you.

16   All right.  So you had also cited *Century Surety versus*

17   *Casino West*, where there was somebody who died in a motel

18   because carbon monoxide fumes came off the pool heater and went

19   into the room and stayed there.

20   And the Court looked at a pollution exclusion, and they

21   were concerned about -- courts went different ways about

22   whether carbon monoxide counts as pollution.  And then they

23   were worried about if you carried things too far and somebody

24   spilled a bottle of Draino that that would in some way be

25   excluded.  Okay.  Nobody slipped on a mushroom here.  Nobody

EXHIBIT L-22

got injured by a COVID-19 test swab.  So we're not really

dealing with that.

        As far as the scope, essentially it looks like we're

dealing with them saying, if you have some kind of loss from a

virus, if you take it from your standpoint that there's some

kind of damage to the property by reason of a virus, they're

saying, okay, that's not covered.

        So then you respond by saying, well, what we're really

dealing with is the order.  And the order doesn't have -- that

might not be covered by this because they might not have been

thinking about stay-at-home orders.  But then that's not really

necessarily physical damage, so you get into a kind of catch-22

there.

        **MR. LEVIN:**  Right.

        **THE COURT:**  Let's face it.  If you want to say that

the restaurant is uninhabitable because of COVID, and you want

to allege that there is damage and by reason of whatever you

want to add, I won't stop you from -- from taking another shot

at it.  It is a motion to dismiss.  And although at least one

or more courts have said dismiss, and essentially it was

dismissed with prejudice, and I forget which of the cases --

        **MR. LEVIN:**  Well --

        **THE COURT:**  Excuse me.  I waited a long time to hear

everybody else.

        Judge Wilson did give that plaintiff leave to amend.  He

EXHIBIT L-23

did mention -- you don't say there's any COVID on your

property.  Has anybody tested Olea?  Is somebody going to go in

there, breathe on a table, and then somebody will go in and

test it and say there's COVID in the restaurant?

I mean, what's going to happen?  You have no idea.  There

probably is no COVID.  It dies after a certain amount of time.

They've been closed.  I don't know.  I mean, I don't know how

you can say there's going to be COVID there.  But you can make

the more general argument that you're making, that it,

nonetheless, could be there, and that could be damage, I guess.

I'm not sure what you're going to say even if there's no

exclusion.  That's what concerns me, you know.  It's not that I

don't want to see your client get coverage.  I mean, I feel

some, you know, empathy for them.  But I don't know that you're

going to be able to do much with it.  I'm, you know, concerned

about that.  But if you want to give that a shot, I think on

the complaint we have now that I'm, in all likelihood, going to

grant this motion.

About the exclusion, the record that's presented to the

Department of Insurance by the Insurance Services Office, is

that available to the public in any way?  Is that a public

record?  Can you get that?

**MR. LEVIN:**  Your Honor, Dan Levin.  I have submitted

the virus -- my understanding, and I'm not a complete expert in

the insurance industry, but the ISO submits policies on behalf

EXHIBIT L-24

1  of the insurance industry that have been approved by the ISO.

2      We are, in other cases, in the process of subpoenaing

3  those records from the ISO, which I believe they'll comply with

4  the subpoenas.  We're debating some of the, you know, what they

5  will produce and what have you, but we're -- we are in the

6  process of trying to obtain that information.  Not

7  particularly, Your Honor, in this case obviously.  We haven't

8  reached that point where we can, you know, conduct discovery.

9  But we are in the process of doing that.  And what I --

10      **THE COURT:**  What would you hope to plead if you get

11  those records that would, in your view, preclude the defendant

12  here from relying on the exclusion to bar coverage for the

13  claim your client is bringing?

14      **MR. LEVIN:**  We believe that the documents that we've

15  obtained, the evidence that we will gather, we believe will be

16  instructive on this Court in determining that the virus

17  exclusion was not intended to cover this pandemic.

18      **THE COURT:**  No, I understand instructive.  But what

19  would it have to say?  What would you have to find?  Would you

20  have to find, for example, that they went in and said, we're

21  only going to use it to cover X, and now they're trying to use

22  it to cover Y?  Is that the point you're going to try to make?

23      **MR. LEVIN:**  Right.  We anticipate that the virus

24  exclusion was intended to exclude coverage for isolated

25  contamination of virus, not for a global pandemic.

EXHIBIT L-25

1          **THE COURT:**  What would isolated mean?

2          **MR. LEVIN:**  Where it's not something that required a

3     city to shut down, where it's a virus that -- a food-borne

4     virus or, you know, whatever it may be for a circumstance that

5     happened at the restaurant or -- or -- that's what I mean by

6     isolated.  Not where it's the government deciding we need to

7     shut down.  In this case it was basically the whole

8     United States because of the pandemic.  We believe we will

9     develop evidence that they didn't intend to cover that.

10          And I think, Your Honor, I do believe that that case that

11    we cited to is instructive, where the policy did include a

12    pandemic.  The defendants draft these policies, not the

13    plaintiff.  And there are certain -- and words mean something.

14    And certain policies in the industry have expanded it to

15    include pandemic.  This one does not appear to do so.

16          **THE COURT:**  Okay.  But just to play this out for a

17    moment.  The defendant doesn't care about this exclusion if you

18    don't have property damage to start with.  In other words, this

19    is its backup position.  You're not covered, but if you are

20    covered we've excluded you.

21          Their position is just making an order is not property

22    damage.  If the order is based on property damage -- for

23    example, if you took the drywall case, and maybe the owner of

24    the building didn't -- didn't find that the building was

25    uninhabitable, despite the fact there were noxious fumes that

EXHIBIT L-26

1    could be very damaging to health in the building, and some

2    building inspector came in and said, okay, we're shutting you

3    down, they're not just shutting them down as a policy, they're

4    shutting them down because there is, according to *Chinese*

5    *Drywall*, property damage.

6        So I'm not sure where it's going to go, but I'm happy to

7    have you make the best record you can on this. And it is a

8    motion to dismiss. At this point I think that it's not

9    inappropriate to decide the case on a motion to dismiss.

10        One of the reasons I asked you whether certain records are

11   available without discovery was to see whether you can plead,

12   you know, your bar to reliance on the exclusion. Since you are

13   getting discovery, apparently in another case, one or more,

14   hopefully you can get that, and I can give you some time to

15   file an amended complaint with the idea that you would get that

16   material hopefully from the Department.

17        Now, that would not be from California Department of

18   Insurance, though, would it? Or would it?

19        **MR. LEVIN:** It may very well be.

20        **THE COURT:** Oh --

21        **MR. LEVIN:** In our case -- to be clear, Your Honor,

22   and I'd have to look at our file, I'm not certain that the ISO

23   in the particular case that we're subpoenaing records to dealt

24   with a California insured. But I do believe that the ISO has

25   submitted records to the California Insurance Department, you

EXHIBIT L-27

1    know, for the insurance industry in California.

2              **THE COURT:**  Well, --

3              **MR. LEVIN:**  But we certainly could, in this case,

4    subpoena those records and get that information.

5              **THE COURT:**  Okay.  Yeah, you might well be able to

6    just get it.  After all, the Department of Insurance has an

7    interest in consumers.  I would think they would be relatively

8    cooperative.

9         Okay.  So where are we?  I think we've probably covered

10   the landscape.  It's an interesting issue.  It's one that's

11   important, obviously, to the plaintiff and to a number of other

12   people.  So --

13        (Audio interruption.)

14             **THE CLERK:**  Sorry, Your Honor.

15             **THE COURT:**  I'm not sure why it's doing it, but at

16   this point I'm just ignoring those words that are coming from

17   some disembodied computer.

18        Yes.

19             **MS. STARGARDTER:**  Your Honor, may I have an

20   opportunity to respond to the regulatory estoppel argument?

21             **THE COURT:**  Yes, go ahead.  I thought -- I'm sorry.

22   Why don't you go ahead and do that.

23             **MS. STARGARDTER:**  Well, Your Honor, I think the

24   argument is flawed for a number of reasons.  One, because under

25   California law, as a primary threshold matter, we don't jump to

EXHIBIT L-28

the reasonable expectations of the insured.  The Court first
has to determine that the policy language is ambiguous.  And it
has to be ambiguous in the terms of the policy itself and in
the facts of the case.

And here our exclusion plainly and clearly states that the
insurance afforded under the policy does not apply to any claim
or loss or damage resulting from or caused by viruses.  And as
plaintiff's complaint alleges, plaintiff's loss is caused by a
virus.  So the exclusion is clear and explicit.  It is not
subject to two reasonably sound interpretations under the facts
of this case.  Second of all, if it's clear and unambiguous, it
applies, and we don't have to look at the drafting history.

Next, the drafting history is important only if the
insured is aware of the drafting history and relied on the
drafting history in purchasing the policy.  And in this
instance regulatory estoppel is dependent on what the
California Department of Insurance or other Departments of
Insurance thought the exclusion meant, not what the insured
thought the exclusion meant.  It's a complete -- I'm sorry,
completely divorced third party.

And I think the *Nammo* case out of Arizona really sets --
articulates why this Court should not adopt a regulatory
estoppel argument in this case.

You need to follow California law.  And under California
law the exclusion is clear, it's ambiguous, it applies under

EXHIBIT L-29

the facts of the case, and it -- and an insurer is entitled to remove coverage for an entire category of risk, which is exactly what Atain has done in this case. And if it does so, the insured can have no reasonable expectation of coverage.

THE COURT: I think you misspoke and said it's ambiguous, it sounded like.

MS. STARGARDTER: Not ambiguous. It's crystal clear.

THE COURT: All right.

MS. STARGARDTER: Thank you, Your Honor. Thank you for letting me make that point.

THE COURT: All right. So, nonetheless, first of all, we don't even know what Mr. Levin is going to come up with in terms of whatever was said or wasn't said to the Department of Insurance by the ISO, if they said anything at all.

And if they said something, is your client stuck with it? And that could just bring up a whole lot of issues that at the moment are almost more just hypothetical because, as Mr. Levin said, he thinks he should be allowed to do discovery. It turns out he is doing it somewhere. Maybe he'll come up with something and then you can decide how much of an argument you want to make to that point if it is actually fleshed out.

In the meantime, then, I will deem the matter submitted. And I'm going to rule and not keep you dangling. You know what my thoughts are on this.

And, again, looking at the policy language, which requires

EXHIBIT L-30

a direct physical loss to or damage to the property, the loss

of or damage to the property, I do find that the plaintiff

really has not plausibly alleged a covered loss but only

detrimental economic impact, which under the *MRI* case is not

sufficient.

It also appears to the Court, at least from the very broad

and what appears to be clear language of the exclusion, that

even if there were deemed to be damage or a covered loss that

it would be excluded under the virus exclusion.  But I do feel

this is the plaintiff's first shot at this, and they should be

given an opportunity.  So I'm going to grant the motion with

leave to amend.

Mr. Levin, how much time do you think you need to put

together whatever further facts you want to add to the

complaint?

**MR. LEVIN:**  Your Honor, as I told you, I know in one

case the subpoenas did go out, and we received objections from

the ISO.

I don't want to get too far ahead of myself, but if we

could have 60 days just to let that discovery play out, I think

that would be helpful.  And I could report back.  Understanding

that Your Honor might not grant my request if we need more

time, I can set forth the reasons why we would request more

time.

I just want to throw out there that we're not solely

EXHIBIT L-31

1  making a regulatory estoppel.  And I understand, Your Honor,

2  you know, you issued a ruling.  We are not making a regulatory

3  estoppel.  We believe under California law, in that case I

4  cited, allows us to also look at what the defendant did when it

5  was drafting the policy, as well, not solely just what the ISO

6  represented to the insurance department.  And under that

7  *Montrose Chemical* case it's not solely what the understanding

8  was of the regulators, but it's the reasonable expectations of

9  the parties as well.

10      **THE COURT:**  All right.  Well, I've already ruled --

11      (Unreportable simultaneous colloquy.)

12      **THE COURT:**  Excuse me.

13  You can put whatever you feel is appropriate in the

14  amended complaint.  If you're saying, all right, we're now

15  switching gears, maybe we're not looking at the ISO because we

16  did discovery and there wasn't anything to help us, how about

17  what did this defendant say?  Well, your client got the policy.

18  And if the defendant told them anything about this particular

19  exclusion, either in writing or orally, then you would know

20  about it.  You don't have to do discovery for that.

21  So you know-- I don't mean to rudely cut you off after

22  I've ruled, but if you get into it then I've got to let the

23  defendant counsel get back into it.  It's not going to change

24  anything because I already ruled.

25  As far as the time, ordinarily, I would make it about a

EXHIBIT L-32

1  month.  You want double that.  Let me see what the defendant

2  has to say about it and whether they really care.  They're not

3  out any money while you're waiting.

4      **MS. STARGARDTER:**  Your Honor, obviously my client

5  would like to shut this down as quickly as possible, but I'm

6  willing to agree with whatever the Court agrees with.  If you

7  think 45, 60 days, you know, that's fine.

8      **THE COURT:**  I was going to go with a month, all right.

9  Sixty seems far off.  You know, at some point I'm going to have

10  to go back and do all this research again and read it all over

11  again.  I'm going to forget what I read to, you know, get ready

12  for this conference.  And I want to kind of keep the general

13  knowledge that I've got fairly current.

14      So let's take a look.  I'm just leaning over.  I may blur,

15  but I'm looking at a calendar.  So today's the 4th.  No, I'm

16  sorry, today's the 11th.  I'd like to forget that particular

17  day, but it is the 11th.  So, let's see.  Well, let's do this.

18  I'm just going to split this and say October 23.  I think that

19  came out to 45 days or essentially six weeks rather than four.

20  Yeah.

21      All right.  If you're on the cusp to get -- somebody has

22  told you "we're giving it to you next Friday," you can ask for

23  an extension on good cause.

24      So the deadline to file plaintiff's First Amended

25  Complaint would be October 23.  That's more than, I think, I've

EXHIBIT L-33

1   given anybody in the past.  So that will help you, hopefully,

2   in that regard.

3       But no matter what I do ultimately, I do think the

4   plaintiff should have a shot at making their very best record.

5   If I end up staying with my initial read of this, at least

6   they'll have had a chance to make their best showing.

7       I will say this, and you can keep it in mind for how

8   you're going to plead an amended complaint.  We are all

9   operating under the same potential of virus-contaminated

10  surfaces.  Every time one of us goes out and touches anything

11  and comes back and puts our hands on a surface, there may be

12  virus.

13      There may be someone in my chambers walking around who's

14  asymptomatic.  We're all living where we're living.  Our houses

15  are not uninhabitable.  Our places of work are not

16  uninhabitable by reason of physical damage.  We are all there.

17      And so it's true in stay at home, at least in California,

18  strangers weren't supposed to be able to come into your house.

19  But we're not all suing saying we've got damage to our house.

20  So I'm not sure where the distinction lies, but I'm leaving it

21  to you to try to make that.

22      And I guess that's all for today.  I thank you, both, --

23          **THE CLERK:**  Your Honor --

24          **THE COURT:**  -- for the work you've put into this.

25      Yes.

EXHIBIT L-34

1      **THE CLERK:** Excuse me. I just wanted to let you know

2  they have an initial case management conference on

3  October 16th.

4      **THE COURT:** Okay. Probably we should move that back

5  to another date without having to have a separate order on

6  that.

7     Thank you, Ms. Geiger.

8     So if we've got October 16, you're not going to file an

9  amended complaint until the 23rd. They'll have a couple of

10  weeks to respond to it. That takes you into around the 6th.

11  And then you know they're going to file another motion to

12  dismiss, so that will be one, two, three, four, five -- we're

13  already into December. I'd say let's move the case management

14  to January 29, with a statement by the 22nd.

15      **MS. STARGARDTER:** Very good. Thank you, Your Honor.

16  Thank you for your time this morning. Appreciate it.

17      **THE COURT:** Thank you, both, very much. I'll leave

18  you to get back to working with all these issues.

19     That will conclude the conference at this time. Everyone

20  stay well.

21      **MR. LEVIN:** Thank you, Your Honor.

22      **MS. STARGARDTER:** Thank you, Your Honor.

23     (At 9:58 a.m. proceedings were adjourned.)

24                - - - - -

25

EXHIBIT L-35

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Thursday, September 17, 2020

_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter

EXHIBIT L-36

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MORTAR AND PESTLE CORP.,<br><br>        Plaintiff,<br><br>   v.<br><br>ATAIN SPECIALTY INSURANCE<br>COMPANY,<br><br>        Defendant. | Case No.  20-cv-03461-MMC<br><br>**ORDER GRANTING DEFENDANT'S<br>MOTION TO DISMISS; DISMISSING<br>COMPLAINT WITH LEAVE TO<br>AMEND** |

Before the Court is defendant Atain Specialty Insurance Company's ("Atain") "Motion to Dismiss Complaint Pursuant to Fed. R. Civ. P. 12(b)(6)," filed August 4, 2020. Plaintiff Mortar and Pestle Corp. d/b/a Olea Restaurant ("Mortar and Pestle") has filed opposition, to which Atain has replied.  The matter came on regularly for hearing on September 11, 2020.  GailAnn Y. Stargardter of Mokri Vanis & Jones, LLP, appeared on behalf of Atain; Arnold Levin of Levin Sedran & Berman LLP appeared on behalf of Mortar and Pestle.

The Court, having considered the parties' respective written submissions as well as the arguments of counsel at the hearing, finds, for the reasons stated on the record at the hearing, Mortar and Pestle has not plausibly alleged a covered loss under the subject policy.

Accordingly, the Motion to Dismiss is hereby GRANTED, and Mortar and Pestle is hereby afforded leave to file, no later than October 23, 2020, its First Amended Complaint.

**IT IS SO ORDERED.**

Dated: September 11, 2020

MAXINE M. CHESNEY
United States District Judge