**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ULTIMATE HEARING** | : | |
| **SOLUTIONS II, LLC,** | : | |
| **et al.** | : | |
| | : | **CIVIL ACTION** |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | **NO. 20-2401** |
| | : | |
| **TWIN CITY FIRE INSURANCE** | : | |
| **COMPANY,** | : | |
| | : | |
| *Defendant.* | : | |

## <u>MEMORANDUM</u>

Plaintiffs in this case have suffered business losses after being forced to close or modify their operations due to the COVID-19 pandemic and consequent government closure orders. Plaintiffs sought indemnity from their insurance provider, Twin City Fire Insurance Company ("Twin City") under their all-risk commercial property policies and Twin City denied their claims. Plaintiffs then filed suit against Twin City for breach of contract and bad faith. This matter is currently before the Court on the Parties' Cross-Motions for Summary Judgment. Having considered the Parties' motions, the Court will grant Defendant's motion and deny Plaintiffs' motion.

## I.  FACTUAL BACKGROUND[1]

Plaintiffs Ultimate Hearing Solutions II, LLC, Ultimate Hearing Solutions III, LLC, Ultimate Hearing Solutions IV, LLC, Ultimate Hearing Solutions V, LLC and Ultimate Hearing Solutions VI, LLC (collectively, "Plaintiffs" or "Ultimate Hearing Solutions") are limited liability companies that operate hearing aid stores and provide hearing tests, hearing aids, and after-care for patients. Plaintiffs are citizens of Pennsylvania. Plaintiffs' Amended Complaint ("Compl."), ECF No. 6. Plaintiffs operate stores at several locations in Pennsylvania, Delaware, Maryland and Virginia. Compl. ¶ 8. Twin City Fire Insurance Company is a citizen of Indiana.[2]

Defendant issued a Business Owner's Insurance Policy to Plaintiffs for the period of April 23, 2019 to April 23, 2020, which Plaintiffs renewed for the period of April 23, 2020 through April 23, 2021. ECF No. 18, Ex. A & B.[3]  The Policies provide that Twin City "will pay for direct physical loss of or physical damage to

---

[1] The following facts are taken from the Parties' Statement of Material Facts as Stipulated by the Parties ("Stip.") and its attachments unless otherwise noted. ECF No. 18. The facts are also undisputed unless otherwise noted.

[2] Because the Parties are completely diverse and the amount in controversy exceeds $75,000, this Court has jurisdiction pursuant to 28 U.S.C. § 1332(a).

[3] As the language at issue in the two policies is the same, the Court will refer simply to the "Policy" or "Policies" for its analysis. The relevant provisions (except for the Virus Exclusion) all come from the "Special Property Coverage Form," labeled Form SS 00 07 07 05 (cited as "Coverage Form"). The Virus Exclusion and Limited Virus Coverage are found in a separate endorsement for "Limited Fungi, Bacteria or Virus Coverage," labeled Form SS 40 93 07 05 (cited as "Virus Coverage").

Covered Property . . . caused by or resulting from a Covered Cause of Loss." Coverage Form at 1. The Policies define "Covered Causes of Loss" as "risks of direct physical loss unless the loss is: a. Excluded in Section B., EXCLUSIONS; or b. Limited in Paragraph A.4 Limitations." Coverage Form at 2. These are all-risk property damage policies, meaning that all risks are covered unless expressly excluded.

At issue here, the Policies provide coverage for business income ("Business Income Coverage") and business income for civil authority actions ("Civil Authority Coverage"). The Business Income Coverage clause states that,

> [Twin City] will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss of or physical damage to property at the "scheduled premises" . . . caused by or resulting from a Covered Cause of Loss.

*Id.* at 10. The Business Income Coverage includes a provision for "Extra Expense," which states that Twin City "will pay reasonable and necessary Extra Expense you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or physical damage to property at the 'scheduled premises.'" *Id.* The Civil Authority Coverage states:

> This insurance is extended to apply to the actual loss of Business Income you sustain when access to your "scheduled premises" is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of your "scheduled premises."

*Id.* at 11.

The Policies also contain the following exclusion ("Virus Exclusion"): "[Twin City] will not pay for loss or damage caused directly or indirectly by …. [the] Presence, growth, proliferation, spread or any activity of … [a] virus." Virus Coverage at 1. The Virus Exclusion has two exceptions: "(1) When 'fungi', wet or dry rot, bacteria or virus results from fire or lightning; or (2) To the extent that coverage is provided in the Additional Coverage – Limited Coverage for 'Fungi', Wet Rot, Dry Rot, Bacteria and Virus with respect to loss or damage by a cause of loss other than fire or lightning" ("Limited Virus Coverage"). *Id.* The Limited Virus Coverage provides as follows:

> We will pay for loss or damage by "fungi", wet rot, dry rot, bacteria and virus.
> As used in this Limited Coverage, the term loss or damage means: (1) Direct physical loss or direct physical damage to Covered Property caused by "fungi", wet rot, dry rot, bacteria or virus, including the cost of removal of the "fungi", wet rot, dry rot, bacteria or virus…

*Id.* at 2. This coverage only applies when the virus is the result of a "specified cause of loss" other than fire or lightning. *Id.* "Specified cause of loss" is defined in the Special Coverage Property Form and means: "Fire; lightning; explosion, windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage." Coverage Form at 25.

Plaintiffs sought coverage under the Policies for alleged losses they sustained because of COVID-19. Twin City denied coverage under the Policies. Plaintiffs then

sued Defendant for breach of contract and bad faith. Plaintiffs argue that their losses are covered under the express coverage language of the Policies and do not fall under any exclusion.  The Parties have stipulated that there was no presence of the COVID-19 virus at any of the insured properties or at any property in the immediate area of Plaintiffs' businesses.  Plaintiffs claim that they experienced a "Covered Cause of Loss" by virtue of the orders by civil authorities which closed or limited the operations of non-essential businesses to prevent exposure to COVID-19 (the "Closure Orders").  As "non-essential" businesses, Plaintiffs claim they were forced to suspend their business operations as a result of the Closure Orders, which Plaintiffs characterized as a "blockade that prevent[ed] employees and patrons from entering the businesses for their intended purpose." Compl. ¶ 14.[4]

## II. PROCEDURAL HISTORY

On May 21, 2020, these Plaintiffs, along with several other LLCs, filed a Complaint against several insurance-provider Defendants. ECF No. 1. The causes of action were severed by Order of this Court (ECF No. 3), and Plaintiffs filed an Amended Complaint (ECF No. 6) against Twin City asserting claims for breach of contract based on Business Income Coverage (Count I) and Civil Authority Coverage (Count II), and bad faith under 42 Pa.C.S. § 8371 (Count III). Defendant

---

[4] The parties dispute whether the Plaintiffs were in fact essential businesses and the extent to which they were able to remain open and operate under the government closure orders. *See* Defendant's Brief in Support of Twin City Fire Insurance Company's Motion for Summary Judgment (ECF No. 20).

filed its Answer on August 21, 2020. ECF No. 17. The parties then filed Cross-Motions for Summary Judgment. ECF Nos. 19 & 20. Oral argument was held on November 19, 2020.

## III.  LEGAL STANDARD

Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  *See* Fed R. Civ. P. 56(a). The moving party bears an initial burden of proving a lack of any genuine issues of material fact.  *See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 & n.10 (1986).  After that burden is met, the nonmoving party must "come forward with specific facts showing there is a genuine issue for trial."  *Id.* (internal citations and quotation marks omitted).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All facts "should be viewed in the light most favorable to the non-moving party, with all reasonable inferences [drawn] in that party's favor." *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (quoting *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006) (internal quotation marks omitted)).  Summary judgment is warranted where the nonmoving party "fails to make a showing sufficient to establish the existence of an element

6

essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* (internal citations and quotation marks omitted).

## IV. DISCUSSION

Plaintiffs claim that Defendant breached their insurance contract by failing to provide Business Income Coverage, Extended Business Income coverage, and Extra Expense coverage (Count I) and Civil Authority Coverage (Count II) to Plaintiffs for their pandemic-related losses. Compl. at ¶ 19-30; *Id.* at ¶ 31-37. Plaintiffs also bring a bad faith claim (Count III). *Id.* at ¶ 38-41.

### A. Breach of Contract (Counts I and II)

Under Pennsylvania law, "[c]ontract interpretation is a question of law that requires the court to ascertain and give effect to the intent of the contracting parties as embodied in the written agreement." *In re Old Summit Mfg., LLC*, 523 F.3d 134, 137 (3d Cir. 2008) (internal citation omitted). The language of an insurance policy "must be construed in its plain and ordinary sense, and the policy must be read in its entirety." *Pennsylvania Nat. Mut. Cas. Ins. Co. v. St. John*, 106 A.3d 1, 14 (Pa. 2014) (internal citation omitted).

The Court's analysis begins with whether a provision in the insurance policy is ambiguous.  When insurance policy language is "clear and unambiguous," a court applying Pennsylvania law must "give effect to that language."  *401 Fourth St. v. Inv'rs Ins. Co.*, 879 A.2d 166, 170 (Pa. 2005).  "Alternatively, when a provision in the policy is ambiguous, the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage."  *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006) (quoting *401 Fourth St.*, 879 A.2d at 170) (internal quotation marks omitted).[5]

A policy is ambiguous "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense."  *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999) (quoting *Hutchison v. Sunbeam Coal Co.*, 519 A.2d 385, 390 (1986)). Under Pennsylvania law, "ambiguity (or the lack thereof) is to be determined by reference to a particular set of facts."  *Id.* at 607.  The "proper focus regarding issues of coverage under insurance contracts is the reasonable expectation of the insured." *Bubis v. Prudential Prop. & Cas. Ins.*

---

[5] Because the policy at issue was drafted by one party and only signed by the other, it is also a contract of adhesion. Under the doctrine of *contra proferentem*, "any ambiguous language in a contract is construed against the drafter and in favor of the other party if the latter's interpretation is reasonable." *Colorcon, Inc. v. Lewis*, 792 F. Supp. 2d 786, 797 (E.D. Pa. 2011) (citing *Sun Co. v. Pa. Tpk. Comm'n*, 708 A.2d 875, 878-79 (Pa. Commw. Ct. 1998) (citing Restatement (Second) of Contracts § 206)).

*Co.*, 718 A.2d 1270, 1272 (Pa. Super. Ct. 1998).  Under Pennsylvania law, even if the terms of the insurance contract arohe clear and unambiguous, the insured's reasonable expectations may prevail over the express terms of the contract.  *See Bensalem Twp. v. Int'l Surplus Lines Ins. Co.*, 38 F.3d 1303, 1309 (3d Cir. 1994). Nonetheless, the language of the insurance contract itself serves as the best evidence of the parties' reasonable expectations.  *See Safe Auto Ins. Co. v. Berlin*, 991 A.2d 327, 332 (Pa. Super. Ct. 2010).

The insured party bears the burden to "make a prima facie showing that a claim falls within the policy's grant of coverage." *State Farm Cas. Co. v. Estates of Mehlman*, 598 F.3d 105, 111 (3d Cir. 2009) (applying Pennsylvania law).  Once that burden is met, the insurance company must "prov[e] the applicability of any exclusions or limitations on coverage." *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996) (applying Pennsylvania law).

Plaintiffs assert that their losses are covered under the Policy.  Its all-risk policy insures against "direct physical loss of or direct physical damage to Covered Property . . . caused by or resulting from a Covered Cause of Loss."  Coverage Form at 1.  "Covered Cause of Loss" is defined as "risks of direct physical loss unless the loss is Excluded . . . or Limited . . . ." *Id.* at 2.  Plaintiffs claim that their losses are covered under the Business Income Coverage, Extra Business Income, Extra

Expense, Civil Authority Coverage, and Limited Virus Coverage endorsements of the Policy.

The Business Income Coverage provision covers certain losses of business income caused by direct physical loss of or damage to the covered property.  It provides that Defendant:

> will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss of or damage to property at the described premises.  The loss or damage must be caused by or result from a Covered Cause of Loss.

*Id.* at 10. "[O]perations" means the insured's "business activities occurring at the 'scheduled premises' and tenantability of the 'scheduled premises'." *Id.* at 24.  The "period of restoration" is defined as the time that "begins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises" and "[e]nds on the earlier of" (1) the "date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality," or (2) the "date when business is resumed at a new permanent location." *Id.* at 24-25. Extended Business Income coverage extends the eligible Business Income Coverage beyond the end of the period of restoration. However, the Loss of Business Income "must be caused by direct physical loss or physical damage at the 'scheduled premises' caused by or resulting from a Covered Cause of Loss." *Id.* at 11.  Under the Policy's separate Extra Expense coverage

provision, Defendant agreed to pay Extra Expense (other than the expense to repair or replace property) to:

> (a) Avoid or minimize the suspension of business and to continue "operations" at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement premises or temporary locations; or (b) To minimize the suspension of business if you cannot continue "operations."

*Id.* at 10.  "Extra Expense" under this provision "means reasonable and necessary Extra Expense [the insured] incur[s] during the 'period of restoration' that [it] would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss."  *Id.*  The Policy also includes an endorsement for Civil Authority Coverage providing that:

> This insurance is extended to apply to the actual loss of Business Income you sustain when access to your "scheduled premises" is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of your "scheduled premises."

*Id.* at 11.

Under Pennsylvania law, the Court first determines whether Plaintiffs have met their burden of establishing coverage under the Policy.  *See State Farm*, 598 F.3d at 111.  The policy provisions that Plaintiffs invoke share certain essential elements.  Business Income Coverage and Extra Expense are tied to "direct physical loss of or damage to property at the described premises."  Coverage Form at 10. Business Income Coverage requires the suspension of operations to be caused by "direct physical loss of or damage to property" of the insured, while the Extra

Expense endorsement covers costs that Plaintiffs "would not have incurred if there had been no direct physical loss of or physical damage to property." *Id.* Each coverage also depends on the existence of a "Covered Cause of Loss." *Id.* The Business Income and Extra Expense coverages *only* apply where the "direct physical loss of or damage to" property is caused by or resulting from a "Covered Cause of Loss."[6] *Id.*

### i.     Direct Physical Loss of or Damage to Property

For Ultimate Hearing Solutions to state a prima facie claim of coverage under the Business Income Coverage or the Extra Expense endorsement, it must show it has suffered "direct physical loss of or damage to" its property.  The parties sharply dispute the meaning of that phrase.  Ultimate Hearing Solutions contends that "direct physical loss of . . . property" is not limited to physical alteration of the property but includes loss of use of its property.  Plaintiffs analogize the virus to odors, carbon monoxide or noxious gasses, which are not tangible or visible yet have been held to render property unusable and constitute a "physical loss."

Third Circuit precedent is on point and instructive here.  In *Port Authority of New York and New Jersey*, the Circuit addressed whether the presence of asbestos

---

[6] Because eligibility for Extended Business Income coverage is predicated on eligibility for Business Income Coverage, coverage under the extended provision is also tied to "direct physical loss of or damage to" property caused by or resulting from a covered cause of loss.  Coverage Form at 11.

in a building constituted "direct physical loss or damage" under New Jersey law. *Port Auth. of N.Y. & N.J. v. Affiliated MF Ins. Co.*, 311 F.3d 226, 235 (3d Cir. 2002). The Court explained that "[i]n ordinary parlance and widely accepted definition, physical damage to property means distinct, demonstrable, and physical alteration of its structure." *Id.* (quoting 10 Couch on Ins. § 148:46 (3d ed. 1998)). Damage by sources unnoticeable to the naked eye must "meet a higher threshold" than "typical examples of physical damage from an outside source that may demonstrably alter the components of a building." *Id.* at 235. Recognizing that the policy at hand also covered "physical loss," the Court concluded that the proper standard for 'physical loss or damage' is one that triggers coverage:

> only if an actual release of asbestos fibers from asbestos containing materials has resulted in contamination of the property such that its *function is nearly eliminated or destroyed, or the structure is made useless or uninhabitable,* or if there exists an *imminent threat* of the release of a quantity of asbestos fibers that would cause such *loss of utility.*

*Id.* at 236 (emphasis added). The criteria for 'physical loss' caused by a source "unnoticeable to the naked eye" is thus "whether the functionality of the . . . property was nearly eliminated or destroyed, or whether the[] property was made useless or uninhabitable" by that source. The "mere presence of asbestos, or the general threat of future damage from that presence, lacks the distinct and demonstrable character necessary for first-party insurance coverage." *Id.* This test is consistent with Pennsylvania law. *See Motorists Mut. Ins. Co. v. Hardinger*, 131 F. App'x 823, 826

(3d Cir. 2005) (finding an issue of material fact existed under Pennsylvania law as to whether a house's functionality was nearly eliminated or destroyed, or made useless or uninhabitable, by the presence of e coli in a well).

The Court agrees with and adopts the conclusion reached by another Court in this district.  In *4431, Inc. et al v. Cincinnati Ins. Cos.*, the Court concluded that, "under Pennsylvania law, for Plaintiffs to assert an economic loss resulting from their inability to operate their premises as intended within the coverage of the Policy's 'physical loss' provision, the loss and the bar to operation from which it results must bear a causal relationship to some *physical condition* of the premises." No. 5:20-cv-04396, 2020 WL 7075318, at *11 (E.D. Pa. Dec. 3, 2020) (emphasis in original).  There must also be an "element correlating to [the] extent of operational utility – *i.e.,* a premises must be uninhabitable and unusable, or nearly as such."  *Id*; *see also Brian Handel D.M.D. v. Allstate Ins. Co.*, No. 20-3198, 2020 WL 6545893 (E.D. Pa. Nov. 6, 2020) (finding *Port Authority* and *Hardinger* preclude a finding of "direct physical loss of or damage to" property where it remained inhabitable and usable, albeit in limited ways).  In sum, while structural damage is not required to show "direct physical loss of" property, the source that destroys the property's utility must have something to do with the physical condition of the premises.

And so, the Court must determine whether there is a genuine dispute of material fact as to whether Ultimate Hearing Solutions' losses "bear some causal

connection to the physical condition of the premises" and whether those conditions "operate[d] to completely or near completely preclude operation of the premises as intended." *4431, Inc.*, 2020 WL 7075318, at *10. Ultimate Hearing Solutions expressly disclaims that the virus was on its property. Stip. ¶ 22. Instead, it claims that the Closure Orders operated as a blockade preventing its employees and patrons from using the property for its intended purpose. Compl. ¶ 14.

This loss, even assuming *arguendo* that the Closure Orders prohibited Ultimate Hearing Solutions and its customers from entering the property, does not bear a causal connection to the physical condition of its premises. Because Ultimate Hearing Solutions expressly denies the existence of anything affecting the physical condition of its premises, its losses are a mere loss of use untethered to the physical condition of the property itself. Reading "direct physical loss of or damage to property" to contemplate mere loss of use is not a reasonable interpretation of the Policy because it does not make sense when reading the contract as a whole. *Colorcon, Inc. v. Lewis*, 792 F. Supp. 2d 786, 797 (E.D. Pa. 2011)(a court must read the contract "as a whole ... it being necessary to consider every part thereof in order to resolve the meaning of a particular part as well as that of the whole")(internal citation and quotation omitted).

If mere loss of use counted as "direct physical loss of" property, the "period of restoration" language would be rendered a nullity. Business Income Coverage

and Extra Expense coverage are only provided during the "period of restoration," defined in part as the time that begins "with the date of direct physical loss or damage" and ends on the earlier of the date when the property is either "repaired, rebuilt or replaced" or when "business is resumed at a new permanent location." Coverage Form at 10.[7]   Built into the Business Income Coverage and related provisions, then, is the idea that there must be something to repair, rebuild, or replace – none of which exists for mere loss of use untethered to a physical condition of the property. *See Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323, 332 (S.D.N.Y. 2014) ("The words 'repair' and 'replace' contemplate physical damage to the insured premises as opposed to loss of use of it."). The Court cannot ignore this period of restoration language; it must construe the Policy as a whole.

Ultimate Hearing Solutions cites *Friends of Danny Devito v. Wolf* to support its claims. *See* 227 A.3d 872 (Pa. 2020). In that case, the Pennsylvania Supreme Court found that the COVID-19 pandemic qualifies as a natural disaster under a statute that defines natural disasters as events that result in "substantial damage to property, hardship, suffering or possible loss of life." *Id.* According to Ultimate

---

[7] Extended Business Income is similarly available during the period immediately after the period of restoration, beginning "on the date the property is actually repaired, rebuilt or replaced and 'operations[]' are resumed." *Id.* at 11.

Hearing Solutions, this case shows that the coronavirus causes "damage to property," not just economic losses; that, because it was compared to a natural disaster, it must be sufficiently similar to fires and earthquakes such that it is also covered under property insurance policies; and that the actual presence of the virus at its property is not dispositive.

However, *Danny Devito* does not support Ultimate Hearing Solutions' claims. First, the Pennsylvania Supreme Court did *not* hold that COVID-19 causes property damage.  It held that COVID-19 is a natural disaster that triggers the Governor's executive authority because the pandemic "is unquestionably a catastrophe that 'results in . . . hardship, suffering or possible loss of life.'"  *Devito*, 227 A.3d at 888 (ellipses in original) (quoting 35 Pa. Cons. Stat. § 7102).  Second, *Danny Devito* has nothing to do with property insurance.  Its discussion of a statute triggering executive authority for various natural disasters has no bearing on how the Court must construe the plain language of an insurance contract, and its discussion of the existence of the virus throughout the Commonwealth of Pennsylvania has no bearing on the application of property insurance coverage to properties in Pennsylvania, Delaware, Maryland, and Virginia, where the Plaintiffs expressly disclaim the presence of the virus.[8]  The devastating impact of the COVID-19 pandemic is not in dispute in this

---

[8] For similar reasons, Ultimate Hearing Solutions' argument that its situation is similar to cases in which courts found physical loss or damage when asbestos, ammonia, or other substances or odors

case, the question is whether the businesses losses suffered by Ultimate Hearing Solutions are covered under the Policy and whether Defendant breached its obligations to Ultimate Hearing Solutions in denying their claims.  Ultimate Hearing Solutions has failed to show it suffered covered "direct physical loss or damage" to its property.

###     ii.     Covered Cause of Loss

The Policy defines a Covered Cause of Loss as "risks of direct physical loss unless the loss is Excluded . . . or Limited . . . ."  Coverage Form at 2.  A Covered Cause of Loss must cause the "direct physical loss of or damage to" Ultimate Hearing Solutions' property for purposes of the Business Income Coverage, Extended Business Income, and Extra Expense endorsements.  For purposes of Civil Authority Coverage, a Covered Cause of Loss must impact property other than Ultimate Hearing Solutions' in the immediate area of the insured property, and the government must take an action prohibiting access to Ultimate Hearing Solutions' property due to that Covered Cause of Loss at the other property.  Coverage Form at 11.

Plaintiffs claim that the Closure Orders constitute a Covered Cause of Loss, but that argument does not fit with the plain language of the Policy.  The government

---

were on properties and affected the properties' functionality misses the mark. Ultimate Hearing Solutions expressly claims the virus is not on its properties.

orders themselves cannot constitute a Covered Cause of Loss under either the Business Income and Extra Expense coverages or the Civil Authority Coverage provisions because they do not entail any risk of direct physical loss to the insured property.  The Closure Orders were issued to prevent the spread of the coronavirus, not in response to any physical condition of the insured properties.  *See, e.g.,* Stip. Ex. D at 1 (explaining that the March 19 Pennsylvania order was issued in response to a "public health emergency of international concern"); *see also* Stip. Ex. E at 1 (explaining that the March 23 Maryland order was issued to "reduce the threat to human health caused by transmission of the novel coronavirus in Maryland, []to protect and save lives, . . . [and to] control the spread of COVID-19").

Ultimate Hearing Solutions' complaint also alleges that the government orders caused direct physical loss and damage to *nearby* property for purposes of the Civil Authority Coverage.  But as a matter of logic, the civil authority orders that purportedly affected access to Ultimate Hearing Solutions' property cannot have been issued due to loss or damage caused to other property by the same orders. Further, the effect of the Civil Authority Coverage is to extend additional coverage to a specific situation that would not otherwise be covered under the Policy—when there is a "Covered Cause of Loss to property in the immediate area" of the insured property, but the actual insured property has not suffered a "Covered Cause of Loss." Implicit in the Civil Authority Coverage is the assumption that the insured property

has not suffered a Covered Cause of Loss. Since the relevant conditions and Closure Orders impacted both the insured property and the properties in the immediate area, the losses suffered by the Plaintiffs cannot fall under the Civil Authority Coverage.

Relatedly, Ultimate Hearing Solutions has not demonstrated any facts to show the existence of any direct physical loss of or damage to nearby property caused by a Covered Cause of Loss.  In support of its argument that the existence of the coronavirus pandemic satisfies this requirement, Plaintiffs cite *Danny Devito* and an unpublished, out-of-circuit case, which do not save their claim.  As explained, *supra*, *Danny Devito* does *not* hold that COVID-19 causes property damage, and the Middle District of Florida case Ultimate Hearing Solutions cites merely denied the insurance company's motion to dismiss that was exclusively premised on the policy's virus exclusion.  *See Urogynecology Specialist of Florida LLC v. Sentinel Ins. Co. Ltd.*, No. 6:20-cv-1174, 2020 WL 5939172 (M.D. Fla. Sept. 24, 2020).[9]  Ultimate Hearing Solutions has not shown a genuine dispute of material fact as to whether the government orders were issued due to physical loss of or damage to nearby property, and without such direct physical loss or damage, there can be no coverage.

---

[9] And even if the coronavirus were present on other properties, that presence would not mean that other properties suffered "direct physical loss" or "damage" as those terms apply in the Policy. Actual or imminent presence of the coronavirus on property does not meet the requirements for direct physical loss of or damage to property under *Port Authority* because surfaces could be disinfected and contamination would not render properties useless or uninhabitable.  *Port Auth.*, 311 F.3d at 235.

Separately, Ultimate Hearing Solutions has not shown a genuine dispute of material fact with respect to whether the Closure Orders prohibited access to its premises. Ultimate Hearing Solutions claims that the Closure Orders barred the public from its premises. *See, e.g.,* Compl. at ¶ 14. They argue that the Closure Orders required all non-life-sustaining businesses to cease operations and close physical locations. *Id.* ¶ 13. However, Ultimate Hearing Solutions fails to adequately respond to Twin City's argument that its businesses were actually essential diagnostic facilities or businesses supplying medical devices and equipment under the respective state orders. *See* ECF No. 20-1 at 5-8. Additionally, Ultimate Hearing Solutions' argument—even setting aside whether or not its businesses were actually essential—fails to distinguish "between [their] place of business (*i.e.*, the physical premises where they operate their business), and the business itself." *Pappy's Barber Shops, Inc. v. Farmers Grp.* No. 20-cv-907, 2020 WL 5500221, at *6 (S.D. Ca. Sept. 11, 2020). Because access to their place of business was not categorically "prohibited" by government order, Ultimate Hearing Solutions has also not satisfied this prerequisite for coverage. [10]

---

[10] Plaintiffs cite *Narricot Industries* for the proposition that prohibition on operating a facility constitutes a "prohibition of access" under Pennsylvania law. *See Narricot Indus., Inc. v. Fireman's Fund Ins. Co.*, No. 01-4679, 2002 WL 31247972 (E.D. Pa. 2002). But that case is distinguishable. While two industrial plants were ordered not to operate, the city also prohibited access to the road that led to one plant, and prohibited road travel to all but emergency personnel around the other. *Id.* at 1-2. Because individuals could not travel on roads that led to the facilities, there was a prohibition on access not present here.

Upon review of Ultimate Hearing Solutions' Policy and relevant case law from the Third Circuit, the Court finds that Ultimate Hearing Solutions has not met its burden to show prima facie coverage under its Policy under either the Business Income, Extended Business Income, or Extra Expense coverages (Count I), or the Civil Authority Coverage (Count II).  Because Plaintiffs have not met this burden, they have not shown that they are entitled to summary judgment on their breach of contract claims or that a genuine dispute of material fact exists that would warrant a denial of summary judgment to Twin City.

### iii.    Virus Coverage

Plaintiffs argue that their losses are covered under the Limited Virus Coverage of its Policies or, failing that, that the virus coverage is illusory. Pursuant to the "Limited Fungi, Bacteria or Virus Coverage," Defendant "will pay for loss or damage by … virus.  As used in this Limited Coverage, the term loss or damage means: (1) Direct physical loss or direct physical damage to Covered Property caused by … virus, including the cost of removal of the … virus."  Virus Coverage at 2.  The aforementioned coverage "only applies when the …virus is the result of one or more of the following causes … (1) A 'specified cause of loss' other than fire or lightning; (2) Equipment Breakdown Accident occurs to Equipment Breakdown Property, if Equipment Breakdown applies to the affected premises." *Id*.  "Specified cause of loss" is defined in the Special Coverage Property Form and means: "Fire;

22

lightning; explosion, windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage." Coverage Form at 25.

Plaintiffs' claims here fail for the same reasons they are not covered under the Business Income Coverage or the Civil Authority Coverage.  The Limited Virus Coverage clearly states that the Policy only covers "Direct physical loss or direct physical damage to Covered Property caused by … virus."  Plaintiffs did not allege that the coronavirus was present at any of their insured properties.  They also have not shown, as discussed above, physical loss or damage to their properties.

Plaintiffs argue that the Court should find coverage under the Limited Virus Coverage because if the Court accepts the Defendant's argument that the provision requires physical damage to the property, that would mean that coverage under this provision is impossible and therefore illusory.   Under Pennsylvania law, the "illusory coverage" doctrine provides that insurance coverage is considered "illusory" where the insured purchases no effective protection. *ACE Capital Ltd. v. Morgan Waldon Ins. Mgmt., LLC*, 832 F. Supp. 2d 554, 572 (W.D. Pa. 2011) (citation omitted); *see also 401 Fourth Street, Inc. v. Investors Insurance Group*, 879 A.2d 166, 174 n. 3 (Pa. 2005).  If an exclusion provision would effectively preclude coverage for all risks reasonably anticipated by the parties under a

particular coverage provision (i.e., an illusory coverage provision), the coverage provision should be enforced in a way that would protect the reasonable expectations of the insured. *Great N. Ins. Co. v. Greenwich Ins*. Co., No. CIV.A. 05-635, 2008 WL 2048354, at *4 (W.D. Pa. May 12, 2008).  Plaintiffs claim it is impossible to conceive of even a single hypothetical situation where a virus would be caused by one of the "specified causes of loss" listed in the Policies and therefore be entitled to coverage under the Policy.

However, Plaintiffs fail to acknowledge that this Limited Virus Coverage provision also applies to fungi, wet rot, dry rot, and bacteria, not just viruses.  While it may be difficult to think of a hypothetical situation where a virus causes physical damage to a property, it is not difficult to imagine that wet rot, dry rot or fungi can cause damage that would satisfy the "direct physical loss or direct physical damage" requirement.  Further, while it may be difficult to imagine, Defendants did in fact identify a case where insured property was damaged due to a virus caused by a Covered Cause of Loss. *See Curtis O. Griess & Sons, Inc. v. Farm Bureau Ins. Co. of Nebraska*, 528 N.W.2d 329 (Neb. 1995) (finding coverage where a windstorm caused insured livestock to become infected with the pseudorabies virus).

### iv.   Virus Exclusion

Even if Plaintiffs had plausibly alleged their losses qualified for Business Income Coverage or Civil Authority Coverage, the Virus Exclusion precludes

coverage. The Virus Exclusion provides that Twin City "will not pay for loss or damage caused directly or indirectly by . . . [p]resence, growth, proliferation, spread or any activity of . . . virus." Virus Coverage at 1. The exclusion applies "regardless of any other cause or event that contributes concurrently or in any sequence to the loss" and "whether or not the loss event results in widespread damage or affects a substantial area." *Id*.

A Third Circuit panel upheld a similar exclusion barring coverage for losses caused by hazardous substances or microorganisms. *See, e.g.*, *Certain Underwriters at Lloyds of London Subscribing to Policy No. SMP3791 v. Creagh*, 563 F. App'x 209, 211 (3d Cir. 2014) (applying microorganism exclusion to bacteria). A sister court also recently upheld a virus exclusion identical to this Policy's as unambiguous. *See Wilson v. Hartford Cas. Co.*, No. 20-cv-3384, 2020 WL 5820800, at *7 (E.D. Pa. Sept. 30, 2020) ("[Insurer] will not pay for loss or damage caused directly or indirectly by ... [p]resence, growth, proliferation, spread or any activity of 'fungi', wet rot, dry rot, bacteria or virus."). In his opinion, Judge Robreno noted that several Pennsylvania courts have also "enforced similar exclusions as unambiguous." *Id.* (collecting cases).  Exclusions are "effective against an insured if they are clearly worded and conspicuously displayed, irrespective of whether the insured read the limitations or understood their import." *Frederick Mut. Ins. Co. v. Ahatov*, 274 F. Supp. 3d 273, 283 (E.D. Pa. 2017). Just as in *Wilson*, "the Policy

language here…is conspicuously displayed, clear, and unambiguous." 2020 WL 5820800, at *7. The coronavirus is a virus, and the Policy explicitly and unambiguously excludes losses caused directly or indirectly by viruses unless they are caused by a specified cause of loss.

By the terms of the Policy, the virus only needs to be one cause of loss, not the sole cause of loss, for the exclusion to bar coverage. That the virus may or may not be present at the insured properties is immaterial—the Plaintiffs alleged that their losses stem from the Closure Orders designed to prevent the exposure to COVID-19 and the spread of the virus. Even if the virus was not the direct cause of the Plaintiffs' losses, it was at least an indirect cause, which is sufficient to bar coverage under the Virus Exclusion clause.

### B. Bad Faith Claim (Count III)

Finally, Ultimate Hearing Solutions claims that Twin City is liable for acting in bad faith. For an action arising under an insurance policy, an insurer/defendant may be liable for interest, punitive damages, court costs, and attorney fees if the insurer acted in bad faith toward the insured/plaintiff. *See* 42 Pa. C.S.A. § 8371. To succeed on a bad faith claim, the plaintiff must satisfy two elements by clear and convincing evidence. *Klinger v. State Farm Mut. Auto. Ins. Co.,* 115 F.3d 230, 233 (1997). The plaintiff must demonstrate that (1) "the insurer did not have a reasonable basis for denying benefits under the policy;" and (2) "the insurer knew or recklessly

disregarded its lack of reasonable basis in denying the claim." *Wolfe v. Allstate Property & Cas. Ins. Co.,* 790 F.3d 487, 498 (3d Cir. 2015) (citing *Terletsky v. Prudential Property & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa Super. Ct. 1994)). Bad faith can include "[a]ny frivolous or unfounded refusal to pay proceeds of a policy," though "mere negligence or bad judgment is not bad faith." *Id.* (quoting *Terletsky*, 649 A.2d at 688). In § 8371 claims, the underlying issue is "the *manner* in which insurers discharge their duties of good faith and fair dealing during the pendency of an insurance claim." *Wolfe*, 790 F.3d at 499 (emphasis in original) (citation omitted). Bad faith can also include a bad-faith delay, *see, e.g., Kosierowski v. Allstate Ins. Co.*, 51 F. Supp. 2d 583, 588 (E.D. Pa. 1999), aff'd 234 F.3d 1265 (3d Cir. 2000), or a "lack of investigation into the facts[] or a failure to communicate with the insured." *Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.*, 193 F.3d 742, 751 n.9 (3d Cir. 1999).

A bad faith claim is an "independent cause of action to an insured that is not dependent upon success on the merits, or trial at all, of the contract claim." *Nealy v. State Farm Mut. Auto. Ins. Co.*, 695 A.2d 790, 792-93 (Pa. Super. Ct. 1997). But, if a bad-faith claim is premised solely on the denial of coverage, the claim must necessarily fail if a court finds that no coverage exists. *See Gallatin Fuels*, *Inc. v. Westchester Fire Ins. Co.*, 244 F. App'x 424, 435 (3d Cir. 2007) ("[I]f the insurer [is] correct as a matter of law in denying coverage, there is no basis for the [bad

faith] claim" premised solely on a refusal to provide coverage) (citing *Frog, Switch*, 193 F.3d at 751 n.9). On the other hand, "if bad faith is asserted as to conduct beyond a denial of coverage, the bad faith claim is actionable as to that conduct regardless of whether the contract claim survives." *Gold v. State Farm Fire & Cas. Co.*, 889 F. Supp. 2d 587, 598 (E.D. Pa. 2012) (citing *Gallatin Fuels*, 244 F. App'x at 435) (analyzing plaintiff's bad faith claim because it was "based largely on behavior beyond [Defendant's] denial of the claim"). That distinction has been accepted when, for example, an insured claims the insurer investigated his claim in bad faith in addition to a bad-faith denial of coverage. *See id.* (collecting cases).

Ultimate Hearing Solutions' bad faith claim consists of three paragraphs in the complaint: (1) that "Defendant Twin City has no actual basis for declining complete coverage of the plaintiffs' claims for damages" (Compl. ¶ 39); (2) that "[t]he refusal of defendant to compensate plaintiffs for losses sustained and its practices in the handling of the claim constitute bad faith towards the insured" (*id.* ¶ 40); and (3) that "Defendant has declined coverage in an intentional, willful and wanton disregard of the terms of the Policy." *Id.* ¶ 41. The first and third paragraph, and the extent to which the second paragraph alleges that the refusal to compensate Plaintiffs was in bad faith, relate solely to the denial of coverage. Accordingly, Ultimate Hearing Solutions' bad faith claim with respect to that conduct must fail

because the Court has found the Policy does not cover Ultimate Hearing Solutions' losses.  *See Gallatin Fuels*, 244 F. App'x at 435.

The Court then turns to Ultimate Hearing Solutions' allegation that Twin City exhibited bad faith "in its practices in the handling of the claim."  Compl. ¶ 40.  In its motion, Ultimate Hearing Solutions argues that Twin City's bad faith is evinced by Twin City's immediate denial of Ultimate Hearing Solutions' claim "without conducting any investigation," and without addressing or acknowledging Ultimate Hearing Solutions' reasonable interpretation of "direct physical loss."  To the extent that these allegations may be construed to extend beyond bad faith in the denial itself to bad faith in the investigatory process or process of denial, Ultimate Hearing Solutions has not met its burden.

In the context of a claim for coverage based solely on the Closure Orders where there are no claims that the insured property or nearby property has been physically damaged and access to Plaintiffs' property has not been entirely prohibited, there is nothing to investigate: coverage does not exist on the face of that claim.  Therefore, Ultimate Hearing Solutions has not shown bad faith in Twin City's lack of investigation or by denying Ultimate Hearing Solutions' claim "in light of the current context of mass denials of COVID-19 related business interruption claims."  Discovery on this issue would not change that conclusion.  Accordingly, Ultimate Hearing Solutions has not shown its entitlement to damages

on its bad faith claim or an existence of a dispute of material fact as to Twin City's

bad faith.[11]

## V.   CONCLUSION

Because the Policies do not cover Plaintiffs' losses, the Court will deny

summary judgment to Plaintiffs and will grant summary judgment to Defendant on

Counts I and II of the Amended Complaint. And because Plaintiffs have not shown

bad faith or the existence of a dispute of material fact as to that bad faith, the Court

will grant summary judgment to Defendant on Count III of the Amended Complaint.

---

[11] Plaintiffs cite this Court's previous opinion in *1009 Clinton Properties, LLC v. State Farm Fire & Cas. Co.*, in which the Court held that, without discovery, a plaintiff could never know whether a claim was denied in bad faith. *See* No. 18-5286, 2019 WL 1023889 (E.D. Pa. Mar. 4, 2019). But that case focused on whether the plaintiff had sufficiently pleaded whether "the insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim." *Id.* at *3 (quoting *Wolfe*, 790 F.3d at 498); *see also id.* at *5 ("Other than the length of time, a plaintiff will never know whether a denial was done in bad faith, i.e., whether the insurance company denied the plaintiff's claim knowing it did not have a reasonable basis to do so."). It also took place at the motion to dismiss stage, when the Court had not yet decided whether the insurance contract was breached. *Id.* Here, the Court has concluded that the contract was not breached and that the Policy does not cover Ultimate Hearing Solutions' losses, so as a matter of law Twin City did not "knowingly or recklessly disregard its lack of reasonable basis in denying the claim." *Id.*; *see also Gallatin Fuels*, 244 F. App'x at 435.